[Civil No. 3945.   Filed May 9, 1938.]

[79 Pac. (2d) 347.]

In the Matter of the Annexation to the CITY OF PHOENIX of Certain Contiguous Territory (Annexation District "A"). JOHN H. UDALL, as Mayor of the City of Phoenix, a Municipal Corporation of the State of Arizona, Appellant, v. W. E. SEVERN, CHARLES A. ADLAM, PATRICK J. SHAUGHNESSY, AMELIA BAS-WITZ, HOVAL A. SMITH, S. B. SHUMWAY, C. M. VANDERFORD, GEORGE C. GIBSON, ROSE GIBSON, FRANK E. MILLER, GLENN E. MINER, HELEN E. STERMER and ROY K. MARSH, Appellees.

66

Mr. I. A. Jennings, City Attorney, Mr. Hess Seaman and Mr. Richard F. Harless, his Assistants; Messrs. Snell, Strouss & Salmon, Mr. J. Early Craig, Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, Mr. T. G. McKesson, Mr. Frank J. Duffy, Mr. T. A.

Carson, Mr. Emmett R. Feighner and Mr. Evan S. Stallcup, for Appellant.

Messrs. Dougherty & Dougherty, Mr. Darrell R. Parker and Mr. J. A. Riggins, for Appellees Severn, Adlam, Shaughnessy, Baswitz, Smith, Shumway and Vanderford; Mr. V. L. Hash, for Appellees Gibson; Messrs. Palmer & Cornelius and Messrs. Cunningham & Carson, for Appellees Miller, Miner, Stermer and Marsh.

Mr. E. C. Locklear, City Attorney, Prescott; Mr. G. H. Drumm, City Attorney, Winslow; Mr. William H. Westover, City Attorney, Yuma; Mr. Stephen D. Monahan, City Attorney, Nogales; Mr. Cullen A. Little, City Attorney, Globe; Mr. George F. Senner, City Attorney, Miami; Mr. James A. Walsh, City Attorney, Mesa; Mr. Martin Gentry, City Attorney, Willcox; Mr. A. Van Wagenen, Jr., City Attorney, Casa Grande; Mr. Edward R. Byers, Town Attorney, Williams; Mr. I. F. Wolpe, Jr., Town Attorney, Wickenburg; Mr. James T. Gentry, City Attorney, Bisbee; Mr. Orinn C. Compton, City Attorney, Flagstaff; Mr. B. G. Thompson, City Attorney, Tucson, and Mr. Arthur Henderson, of Counsel, for City of Tucson, *Amici Curiae.*

LOCKWOOD, J.—The city of Phoenix filed a petition in the superior court of Maricopa county, through its mayor, John H. Udall, hereinafter called plaintiff, reciting that said city, desiring to annex a certain area lying immediately adjacent and contiguous to its corporate limits, had adopted a resolution under the provisions of sections 416, 417, and 418, Revised Code of 1928, authorizing him to petition to the superior court of Maricopa county to order such annexation to be made. The court fixed a time for hearing

the petition and a number of citizens of the area which was sought to be annexed, whose names it is not necessary to give, but whom we shall hereafter call defendants, appeared and objected to the jurisdiction of the court, on the ground that the sections, under which the annexation was sought, violated the Constitution of Arizona, in that they constituted an attempt to delegate to the courts the exercise of powers properly belonging to the legislature, and for that reason the statute conferred no jurisdiction upon the court. The matter was heard at length, and the court concluded that the sections were a delegation of legislative power to the judiciary, and therefore unconstitutional and void, and dismissed the petition, whereupon this appeal was taken.

One of the fundamental principles of the governmental system of our federal republic is what is known as the rule of divided powers. As a corollary to this principle it has usually been accepted, even in the absence of an express constitutional provision to that effect, that neither of the three great departments of state should exercise the powers of either of the other two. The makers of our Constitution were not satisfied with an implied limitation and placed in that instrument article 3, which reads as follows:

"The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others."

■■ The power to create and to destroy municipal corporations, and to enlarge or diminish their boundaries is universally held to be solely and exclusively the exercise of legislative power. We do not know of any well-considered cases which hold to

the contrary.  *Lyon* v. *City of Payette,* 38 Idaho 705, 224 Pac. 793; 1 Dillon, Mun. Corp., 5th ed., p. 61; 19 R. C. L. 700; 12 C. J. 856.  And indeed our Constitution has, in substance, so stated.  Article 13, § 1; article 4, pt. 2, § 19, subd. 17.  When, therefore, the question before the court is whether or not a statute which confers upon the courts the final power to determine whether land should be annexed to an existing municipal corporation is constitutional, and the only limitation upon the exercise of that power is that the court shall determine the issue without any standard or rule to guide it but its own view as to the political and economic expediency of the annexation, it would seem axiomatic that the power so to be exercised by the court was legislative in its nature, rather than judicial.  Strange as it may seem, however, there are courts which have upheld the right of the legislature to delegate such a power to the judicial department of the government.  An analysis of the cases which thus hold shows clearly the conditions and the reasoning which led up to these conclusions.

In the absence of a constitutional restriction the power of the legislature over municipal corporations is practically unlimited.  It may incorporate or disincorporate them; it may add to or take away from their territorial area; it may grant to or take away from them such powers as it may see fit.  The earlier American Constitutions placed no limit upon this power, but as time went on it became apparent to the people of many of the states that it was being abused by the granting of special privileges to particular cities on terms different from those required of other municipalities.  In the territory of Arizona this condition obtained from its organization until July, 1886, when the Harrison Act (48 U. S. C. A., sections 1471–1473, 1475, 1478, 1479), was passed, which provided, in substance, that no local or special laws

should be passed incorporating cities, towns, and villages. In 1912, the makers of the Constitution were convinced, after some 25 years of experience, that this was a wise and salutary policy, and wrote the same provision into the Constitution in even more stringent form. As a result, all municipalities created in Arizona since statehood owe their existence and development to general statutes, and not to special charters, except such as were organized under section 2, article 13 of the Constitution, usually known as the "home-rule" cities, and a similar condition existed in a great many other states. But the same desire for special privileges which led to the granting of special charters before the various constitutional restrictions were adopted still existed, and, as is always true when the desire of some individual or group is in conflict with the law declared by the entire citizenship, a means was sought for avoiding, if not evading, the principle laid down in the Constitution. Many, if not most of the courts which have held acts of the character of the one in question to be constitutional, have admitted more or less clearly in their opinions that the reason for their departure from the natural and logical conclusion which would be drawn from an application of the usual rules of constitutional construction was an attempt to evade the effect of those principles. Their argument is that since the legislatures were limited to the incorporation and regulation of municipalities by means of general laws, and since general laws could not cover the subject sufficiently to meet the various exigencies of the situation in regard to the different municipalities, that it was necessary in some way to get around the constitutional provision so as to permit what was in fact special legislation to fit the particular case. As the exercise of discretion as to a particular municipality *by the legislature* would openly violate the constitutional

provision, it was concluded that perhaps a delegation of that discretion to the judicial department of the government might be a constitutional method of "whipping the devil around the stump."

We have examined the various cases cited in support of the position taken by plaintiff, and, in so far as they sustain that position, they are based upon two considerations, (a) the inconvenience which might be caused to some municipalities if they were forced to conform to general laws, and (b) that while such acts do delegate legislative power to the judicial department of the government, the delegation was, after all, only of a "modicum" of such powers. So far as the argument of inconvenience is concerned, it seems to us that the courts can hardly say, with good grace, that a restriction deliberately imposed by the people in their Constitution, after experience with a contrary rule, is an inconvenience of the kind they should assist the legislature in evading. Constitutional mandates are not lightly to be disregarded by any of the departments of the government, and particularly not by that one which has always been considered in our system as peculiarly the guardian of the Constitution.

A determination of whether the delegation of what is called by some of the cases a "modicum" of legislative powers to the judiciary is constitutional is one of more difficulty. Chief Justice MARSHALL, in speaking of the division of powers, in *Wayman* v. *Southard,* 10 Wheat. 1, 6 L. Ed. 253, said:

"The difference between the department undoubtedly, is that the legislature makes, the executive executes, and the judiciary construes the law; but the maker of the law may commit something to the discretion of the other departments, and the precise boundary of this power is a subject of delicate and difficult inquiry, into which a court will not enter unnecessarily."

The statement thus made is undoubtedly correct, and courts will not unnecessarily enter into the question of whether the constitutional inhibition has been violated, but when it is specifically contended that a certain act is unconstitutional, as being a violation of such a constitutional limitation, we have no option but to consider the question and determine whether, in the particular case, it falls on the one side or the other of the dividing line between constitutional and unconstitutional delegations of power. The question has been discussed in the case of *State* v. *Neble,* 82 Neb. 267, 117 N. W. 723, 19 L. R. A. (N. S.) 578, and the court says:

"In the investigation of this question, we are confronted with the unusual and anomalous condition of meeting with many apparently well-considered cases sustaining every contention of either side, and it will be absolutely impossible for us to follow any line of decisions which will not be antagonized by holdings in many other cases, for there is a sharp conflict of authority upon every conceivable feature and phase of the case. It could serve no good purpose for us to discuss and attempt to harmonize the views of Montesquieu, Jefferson, Madison, Hamilton, Stevens, Wilson, Goodnow, and others upon the question here involved, for the reasons that it would be impossible to bring harmony out of the chaos produced by their divergent opinions, and that such discussion would extend this opinion to an unreasonable length, ending where we begin, and for the further reason that the time at our disposal is not adequate to the task. We will, therefore, be content with a brief reference to some of the later decisions, and an effort to arrive at the spirit and meaning of our own Constitution as interpreted by the courts, the Legislature, and the judicial and administrative history of the state. The provision of the Constitution that 'the powers of the government of this state are divided into three distinct departments, the legislative, executive, and judicial, and no person or collection of persons being one of

these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted,' is not a new one in the Constitutions of this country. It has been handed down from the best thinkers and greatest statesmen of the nation to nearly all state Constitutions in one form or another, and, even where not adopted in terms, it has been almost uniformly recognized as a part of our governmental system (*State* v. *Brill*, 100 Minn. 499, 111 N. W. 294, 639 [10 Ann. Cas. 425]), but has never been strictly applied, and indeed could not be, to all the ramifications of state or national government. The duties of the officers of the several departments have, to some extent at least, overlapped and interlaced until it is hard to say in some cases where the one leaves off and the other begins. Many times the courts have defined certain duties of the executive or administrative officers as '*quasi* judicial,' and recognized and confirmed the validity of the acts of such officers. While this definition has been approved and sanctioned by all, yet the fact remains that the function of the act itself is either administrative or judicial, and there can in reality be no middle or halfway ground between them. This being true, we are brought to the conclusion that many executive or administrative acts performed by judicial officers, and many judicial acts performed by ministerial officers, are and must be held valid, notwithstanding the section of the Constitution above quoted. Thus it often becomes necessary to the full and proper discharge of the duties imposed upon an official belonging to one class to perform an act the function of which, strictly speaking, belongs to another.

"The performance of such duties being, to some degree at least, *essential to the full discharge of the duties imposed and properly within the power of the actor,* the power conferred must be held to be valid; otherwise a condition of chaos would arise. . . . " (Italics ours.)

The Supreme Court of Wisconsin, in the case of *In re Griner,* 16 Wis. 423, 447, in discussing the question of whether a certain statute unlawfully delegated

legislative power to the administrative branch of the government, said:

" . . . The reasoning by which this position was attempted to be sustained, was very able and elaborate, and may be briefly stated as follows: That the making a draft or a conscription law is the highest exercise of legislative power; that all power over this subject is vested exclusively in congress; that by the spirit and principles of the constitution, the powers of the government are divided into three departments: the legislative, the executive, and the judicial; that it is the peculiar function of the legislative department to make the law, of the executive to execute it, and the judicial to construe it; that these powers are not to be confounded or delegated by the one department to the other; and that congress, in authorizing the President to make all necessary rules and regulations for enrolling the militia, and curing defects in existing state militia laws, attempted to confer upon him high legislative powers.

"The general soundness of this argument will not be questioned. Most of the propositions stated, are recognized political maxims under our form of government. It is only the conclusion or deduction from those propositions about which any doubt can exist. No one will seriously contend that congress can delegate legislative power to the president. But a distinction must be made of *'those important subjects which must be entirely regulated by the legislature itself, from those of less interest in which a general provision may be made, and power given to those who are to act under such general provision to fill up the detail.'* . . . This practice of giving discretionary power to other departments or agencies, who were intrusted with the duty of carrying into effect some general provisions of law, had its origin at the adoption of the constitution, and in the action of the first congress under it, as the federal legislation abundantly shows. It was undoubtedly in strict conformity to the views entertained by the great statesmen of that day, of the genius and intent of the instrument which they had had such a great share in framing. They could not have regarded it as a delegation of the

legislative power of congress. This practical construction of the constitution, so frequently and constantly manifested in the federal legislature, is worthy of serious consideration.

" . . . The courts, for example, may make rules directing the return of writs and processes, the filing of declarations and other pleadings, and other things of the same description. It will not be contended that these things might not be done by the legislature, without the intervention of the courts; yet it is not alleged that the power may not be conferred on the judicial department. The line has not been exactly drawn, which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provision to fill up the details. . . . " (Italics ours.)

In the case of *Fox* v. *McDonald,* 101 Ala. 51, 13 So. 416, 46 Am. St. Rep. 98, 21 L. R. A. 529, the Supreme Court of that state had under consideration a similar question, and said:

" . . . Keeping these definitions in view, we can the better determine the vital question arising upon the contention now under discussion in this cause, which is, what powers of government does the constitution intend shall be confided to the exercise, respectively, of these several governing bodies? Now, it must be conceded that the powers thus vested in these several departments are intended to be committed to their exclusive exercise; and this, independently of the provision that no person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others. . . .

"The argument is that the nature of the act to be performed must in every instance determine the question; and that nature being found to be legislative, executive, or judicial, the performance of the act must be assigned to the appropriate state department. We are quite clear the contention takes a step too far. . . . When we take our constitution, therefore, and read

it in the light of this history, we see plainly that it was not intended to declare that every act pertaining to government, and the regulation of the social and property rights of the citizen, should be exercised exclusively by the legislative, executive, or judicial department of the state government, or some member of it, according as the act possessed a legislative, executive, or judicial character, for we find there are many such acts especially peculiar to the very nature of our system, and necessarily inherent in it, which, time out of mind, have not been exclusively exercised by these departments, and which, for the ease and efficiency of our system, could not be so exercised. . . .

" . . . Other illustrations might be given, but these suffice to make clear the principle that the constitution must receive an enlarged and liberal interpretation, and the intention of its framers ascertained upon a broad view of the history and experience, the needs and usages, of the time, and the great general purpose they had in view, of framing a comprehensive and beneficent government. Thus viewed, we irresistibly conclude that it was not the intention of the constitution to declare that all these powers and duties, so indispensable to efficient government, and so long exercised, under legislative sanction only, by these officers and agencies of legislative creation, properly belong to the legislative, executive, or judicial body of magistracy created by the constitution, because alone they may partake of a legislative, executive, or judicial nature. . . .

" . . . 'Besides the power to make general rules, for the government of officers and persons, and regulating the rights and classes of persons, or of the whole community, there is a large class of powers recognized as legislative, occupying an intermediate space between those of a judicial character, on the one side, and the executive, on the other, and which are not, and cannot be marked off from these by any clear line.' "

■ Taking these cases, and the many others which might be cited where the same matter is under con-

sideration, we think the true rule is this: Where the Constitution expressly, or by implication, confers a certain power on one of the great departments of the government, that power may not be delegated to another department, but where the power so conferred is being exercised by the proper department and it is necessary, in order to carry out such a constitutional power, that some acts be performed which in their nature are more properly to be classified as falling under the jurisdiction of another department, such latter acts, *being merely auxiliary to and dependent upon the proper carrying out of the legitimate power of the department,* are not a violation of the constitutional inhibition. Thus, in the present case, the substantive power which is to be exercised is the annexation of certain territory to the city of Phoenix. As we have pointed out, that power is both expressly and impliedly vested in the legislative department of our government by our Constitution, and a delegation of such substantive power would, therefore, be a violation of article 3, *supra,* of our Constitution. But if, after the proper exercise of such power, it should become necessary to determine whether the conditions laid down by the legislature exist, a function strictly judicial in its nature, the legislature may provide that, *after* such determination, the courts may perform some acts which might be administrative or legislative in their nature, merely as auxiliary to carry out the legislative purpose, such as calling an election, and appointing officers for that purpose, without violating article 3 of the Constitution. So again the judicial department of the government is given the constitutional power to try and determine all controversial cases properly brought before it, according to the recognized principles of law. This power may not be taken away from the judicial department by the legislature nor delegated to either of the other two

great departments. If, in the proper exercise of this judicial power, it should be necessary, merely as auxiliary thereto and for the proper exercise of such power, for the courts incidentally to perform some acts which are, strictly speaking, legislative in their nature, such as the making of rules of procedure, the better to carry out their constitutional powers, this would not be an invasion of the legislative department of the government. As was said many years ago by the great Chief Justice in the famous case of *McCulloch* v. *Maryland,* 4 Wheat. 316, 4 L. Ed. 579:

" . . . Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

Let us consider briefly the cases relied upon by plaintiff in support of his contention, in the light of this rule. In *Morris* v. *Taylor,* 70 W. Va. 618, 74 S. E. 872, the court said (page 875):

"If the vesting such discretion as we are discussing in a court carried with it a *modicum* of legislative power, it would not amount to inhibited delegation thereof." (Italics ours.)

Such a legal interpretation, if it is to be applied to an *end* which is by the Constitution declared to be legislative in its character, rather than merely a *means* to that end, can be based only on the theory as stated in the case just cited, as well as others to which we shall refer, that the constitutional inhibition only means that the *entire* legislative power shall not be delegated to the judiciary. We confess we are unable to agree with the reasoning which reaches this conclusion. If it be correct, then the legislature may turn over to the courts the power to pass any particular law which it, for some reason, does not wish

to adopt, and the judicial department must take the responsibility therefor, because, in so doing, it is not delegating the *entire* legislative power, but merely that pertaining to the *particular subject* under discussion, or they may, in effect, say that the courts constitute a third house of the legislature, and that it is necessary to convince their discretion of the wisdom, as well as the legality, of some particular policy in order that the act authorizing it be valid.

It is claimed that the Supreme Courts of Montana, Virginia, South Dakota, Nebraska, Florida, and Iowa also sustain the contention of plaintiff. Let us analyze the cases cited by him from these states, together with their reasoning. The first is that of *City of Burlington* v. *Leebrick,* 43 Iowa 252. The Iowa statute is the same in substance as that found in Arizona, so far as the particular issue involved is concerned, for it authorizes the incorporation, after the findings of certain jurisdictional facts set forth in the statute (Code 1873, § 431),

"If the court find the allegations of the petition to be true, and that justice and equity require that said territory, or any part thereof, should be annexed to such corporation,"

the court shall so order. The court, in substance, states that the determination of the particular facts *which confer jurisdiction of the court,* such as the contiguity of the territory, its area and population, is a judicial act, saying:

"It is as much a judicial act to determine what are the facts of a particular case, and whether they bring the case within the operation of a recognized principle of the existing law."

This of course is true. But it utterly ignores any discussion of the question of why the leaving of the ultimate question of "justice and equity" to the un-

fettered discretion of the court is not legislative, and merely arbitrarily states, in the conclusion of its opinion, that it is not.

The case of *Henrico County* v. *City of Richmond*, 106 Va. 282, 55 S. E. 683, 117 Am. St. Rep. 1001, argues that the question of incorporation is one of expediency, and then, notwithstanding that the determination of the expediency of the act is, of all things, a legislative function, says:

"These are matters of fact, and, when they so exist as to satisfy the judicial mind of the necessity for or expediency of annexation, then, in accordance with the provisions of the act, the same must be declared."

In other words, the legislature says that the very factor which makes a determination of the question legislative in its character is a judicial act.

The Supreme Court of Utah, in the case of *Young* v. *Salt Lake City*, 24 Utah 321, 67 Pac. 1066, considered the same question. It, like most of the other cases which take this attitude, starts off by arguing quite correctly that the determination of the existence of jurisdictional requisites of area, population, and the like fixed by the legislature is a judicial matter; calmly assumes what seems to be not merely a *non sequitur*, but an absolute contradiction in terms that since the determination of these *facts* is a judicial act, the determination of *policy* as to the addition of territory is also judicial in its nature, and then proceeds, as if realizing the weakness of the argument, to raise the question of *expediency* under the constitutional provision preventing legislatures from granting special charters.

The case of *Pelletier* v. *Ashton*, 12 S. D. 366, 81 N. W. 735, again starts out by pointing out the judicial character of a determination of the existence of the

*facts* fixed by the legislature as requisite for annexation, and then immediately, without any reasoning to support such conclusion, states that the determination of *policy* is also judicial in its nature.

In the case of *City of Wahoo* v. *Dickinson,* 23 Neb. 426, 36 N. W. 813, the Supreme Court of Nebraska first properly separates the jurisdictional determination of an issue of fact from the question of abstract justice and equity, and then arbitrarily states, without giving any reason therefor, that the determination of these latter questions is also a judicial act, referring to *City of Burlington* v. *Leebrick, supra,* as authority therefor, and that court has consistently followed the case just cited.

The case of *Incorporated Village of Fairview* v. *Giffee,* 73 Ohio St. 183, 76 N. E. 865, is not in point, for the Constitution of Ohio had no provision in it expressly distributing the powers of government, or preventing the legislature from delegating legislative powers to the judicial department.

The case of *O'Neill* v. *Yellowstone Irr. Dist.,* 44 Mont. 492, 121 Pac. 283, recognizes the general rule as stated above by us, but fails to recognize that the determination of the *policy* of establishing the municipal corporation is a legislative *end,* rather than a *means* to a judicial *end.*

This practically concludes the states and the courts which apparently sustain the position of plaintiff.

Upon an examination of many of the cases cited by him as sustaining his position, we find they are directly opposed to that doctrine. Even in the state of Iowa, in the case of *Denny* v. *Des Moines County,* 143 Iowa 466, 121 N. W. 1066, the court has stated (page 1069):

" . . . that if the proceeding involves the determination of a legislative question, or the exercise of administrative powers, the statute is unconstitutional, and that such statutes can be upheld only where they

leave to the courts the determination of questions of *fact,* as distinguished from the exercise of a *general discretion involving the public interest.''* (Italics ours.)

Thus denying to the courts the exercise of a discretion *based upon what the public interest requires.*

In the case of *People* v. *Fleming,* 10 Colo. 553, 16 Pac. 298, the statute in question gave no discretionary power to the court, but sets forth specific facts which, if found by the court to exist, required it to appoint five commissioners to supervise an election to be held in determining whether or not the incorporation should be done. The statute made no attempt to confer any discretionary power, based on a supposed public interest, or equity and justice, upon the court. This is clearly an exercise of an auxiliary administrative act to carry out the will of the legislature when the court found the jurisdictional facts to exist.

In the case of *Town of Edgewater* v. *Liebhardt,* 32 Colo. 307, 76 Pac. 366, decided later, the court points out (page 367) clearly the difference between statutes containing the provision, ''if justice and equity require that such territory should be disconnected,'' and those which leave no discretionary power to the court, stating that it is only when the court is required to determine as a question of *fact* the existence of specific conditions fixed by the legislature that it is acting judicially.

In the case of *Burnett* v. *Greene,* 97 Fla. 1007, 122 So. 570, 69 A. L. R. 244, the court says (page 576):

''In our opinion, there are three of the conditions required which are illegal and not within the power of the Legislature to impose. The first is that it cannot delegate its power to determine whether the establishment of a drainage district *will be in the 'interest of public health, convenience or welfare';* second, it cannot establish such a district merely because it will be for the 'advantage of the owners of the real prop-

erty therein'; and, third, if it is a legislative function to determine those questions, it may not require a person belonging to the judicial department to exercise the power which appertains to the legislative department.

"The power sought to be conferred is not a judicial power which may be exercised only by courts, because a court is a body in the government for the public administration of justice. Its purpose and sole function is to administer exact justice, as nearly as may be, to all parties before it, not to determine the wisdom of a public measure designed to promote the 'public health, convenience or welfare.' See *Johnston* v. *Hunter*, 50 W. Va. 52, 40 S. E. 448." (Italics ours.)

It is true that on rehearing (105 Fla. 35, 144 So. 205), the court reversed its decision on this point, saying merely (page 206):

"There is nothing in the Constitution forbidding a statute to authorize a finding by the circuit court that the establishment of a drainage district, 'will be for the advantage of the owners of the real property therein,' or that the district 'would be in the interest of the public health, convenience or welfare.' Advantage or benefit to the owners of real estate in the area afford the considerations and reasons for establishing drainage districts under the authority of statutes,"

but two of the judges dissented in a most powerful and well-written opinion, discussing the issue exhaustively.

In the case of *Lyon* v. *City of Payette, supra,* the court clearly points out the distinction between cases where the only power delegated to the court is that of determining the existence of the *facts* required by the statute and the granting of discretion to the court in determining whether justice, equity, and the interest of the public require the incorporation, and pointed out that it is only where the granting of annexation is mandatory, if the court believes the *specific jurisdic-*

*tional facts* set forth in the statute exist, that such an act is constitutional.

The case of *Forsythe* v. *City of Hammond,* 142 Ind. 505, 40 N. E. 267, 41 N. E. 950, 30 L. R. A. 576, is not in point for the reason that the authority delegated was given to the county commissioners of Lake county, a body similar to our board of supervisors, and not to one of the courts. The question, however, was more specifically raised in the same case, when it was heard at a later time, and it was pointed out that it was only the power to determine the existence of certain specific conditions by the court which might be delegated.

In all these cases there is an apparent failure to recognize the difference between the power to determine the *policy* of an *end,* given by the Constitution to the legislative branch alone, and the exercise of means to ascertain whether the legislative policy is properly followed.

When we come to a consideration of the states which have gone into the question more thoroughly, we find the reasoning logical and an attempt to obey, rather than to evade, the plain principles of the Constitution. The case of *People* v. *Town of Nevada,* 6 Cal. 143, was decided in 1855. It held specifically that the incorporation of towns was a legislative act, and that the courts might not be required nor permitted to perform legislative functions. Not long after, in the case of *City of Galesburg* v. *Hawkinson,* 75 Ill. 152, the Supreme Court of Illinois, acting under a Constitution similar to that of Arizona, discussed at great length the effect of a statute almost identical in language with ours. It says:

" . . . The attempt here is to invest the judiciary with power, not merely to determine whether certain prescribed conditions upon which the law is to take effect, exist, but whether as to a certain locality there

ought to be a change in the existing law on a particular subject, and if in the opinion of the court the change ought to be made and injustice will not be done thereby, it is empowered to make it. . . . Whether cities, towns or villages should be incorporated, and, if incorporated, whether enlarged or contracted in their boundaries, presents no question of law or fact for judicial determination. It is purely a question of policy, to be determined by the legislative department. . . .

"The proposition, to our minds, may be reduced within a very small compass. The same power cannot be either legislative or judicial, as the legislature may incline to retain it, or surrender it to the judiciary. If the boundaries of municipal corporations can be altered and changed by the legislature, in its discretion, and the authorities are all that way, then it is impossible that the courts can be invested with such power. Courts may determine what are the corporate limits already established; they may determine whether what is claimed by the municipal authority to be the corporate limits is so or not, and they may inquire whether the legislative authority has exceeded the powers with which it is invested; *but all this implies an existing law, applicable to the particular subject,* and the inquiry is, *what is the law, and has it been violated or complied with?* Here, however, the inquiry is, *what shall the law be,* as respects the boundaries of this city; shall it be as designated by the charter, or shall it be as prayed by the petitioners? *And the decree of the court is the answer.* That decree assumes to be, not a declaration of rights under the law, *but the law itself,* amending and changing a previous statute, as to the extent of territory over which a particular municipal government shall obtain." (Italics ours.)

The Supreme Court of Minnesota had before it a statute in substance like ours. It said, in the case of *State* v. *Simons,* 32 Minn. 540, 21 N. W. 750, as follows (page 751):

"It will be observed that under the provisions of this act the legislature has not, except as to certain

preliminaries, determined or defined the facts or things upon the existence of which the territory shall be incorporated as a village. It will also be observed that the duty of the court is not simply to inquire and ascertain whether certain specified facts exist, or whether certain specified conditions have been complied with, but to proceed and determine whether the interests of the inhabitants will be promoted by the incorporation of the village, and, if so, what land ought in justice to be included within its limits. In short, it is left to the court to decide whether public interests will be subserved by creating a municipal corporation, and the determination of this question is left wholly to his views of expediency and public policy. That the determination of such .question involves the exercise of purely and exclusively legislative power seems to us too clear to admit of argument. The granting of all charters of incorporation involves the exercise of legislative functions. The proposition (says Dillon) which lies at the foundation of the laws of corporations of the country is that they all, public or private, exist and can exist only by virtue of express legislative enactment creating or authorizing the creation of the corporate body.''

The state of Nevada has a constitutional provision similar to ours, and its legislature adopted an act providing that, upon certain jurisdictional conditions being found by the court to exist, it should appoint commissioners for the purpose of holding an election, a situation similar to that described in the case of *People* v. *Fleming, supra.* The case of *State* v. *Second Judicial Dist. Court,* 30 Nev. 225, 94 Pac. 70, pointed out the difference between statutes where the court had a mandatory duty imposed upon it, in case it found the existence of certain specific facts, and where its action was in the end dependent upon its discretion, stating that the one would be constitutional, while the other would not be.

In the case of *In re Village of Ridgefield Park,* 54 N. J. L. 288, 23 Atl. 674, the act under discussion gave

discretion to the court to determine whether the public interests would be served by the incorporation of the municipality, and it was held that such power could not be conferred upon the judicial department of the government since the act was essentially legislative in its character.

In the case of *Glaspell* v. *City of Jamestown,* 11 N. D. 86, 88 N. W. 1023, the reasoning of the court is so clear that we quote from it somewhat at length (page 1025):

"In this case the decision must turn upon the question whether the duty devolving upon the court, of determining whether such territory ought to be excluded from the corporate limits, and whether the petition can be granted without injustice to the interested parties, be a judicial or a legislative power. If a decision of the matters prayed for in the petition involved decisions of questions of fact only, then the power conferred upon the court would be judicial. The facts to be found relate to the character of the land; its location, occupancy, ownership; benefits accruing by being within the corporate limits; burdens upon it by reason of city taxation; the presentation of a petition to the city council; the refusal of the city to grant it; publication and service of notices; and whether the proceedings were in all things regular. Passing upon these questions and making findings of fact thereon would involve the exercise of judicial power. Having made such findings, the duty of the court, as prescribed by the law, is not fully performed in relation to the matter. The court must proceed further, and determine whether the petition 'ought to be granted and can be granted without injustice' to the interested parties. It is apparent that such a determination goes further than the mere finding of a fact. It involves the reaching of a conclusion from the facts found as to the policy of restricting the corporate limits of the city,—not only the policy for the present, but for the future. It determines the limits of the city; the jurisdictional limits of its courts and taxation powers; the effect upon its schools

and people; and, in short, determines the same identical questions of public policy involved always in the exercise of legislative duties or powers. When exercised as to the organization of cities, it determines whether the charter shall be amended in the matter of boundaries; it determines whether the boundaries of the city shall be changed,—something that can be done in no other way, under present laws, than by the passage of an ordinance. This seems to us to involve the exercise of what is clearly legislative discretion. It is more than the finding of facts. It necessarily compels the finding of conclusions,—*not conclusions as to the law applicable, but conclusions as to the wisdom or policy of the relief sought.* Whether such action is expedient is necessarily involved. Such duty requires to be done more than is included in the ordinary and accepted meaning of a judicial act,—a determination of what the existing law is in relation to some existing thing already done or happened. It falls within the definition of legislative action, viz., a predetermination of what the law shall be, for the regulation of all future cases falling under its provisions.'' (Italics ours.)

The Supreme Court of Wisconsin, in the case of *In re Village of North Milwaukee,* 93 Wis. 616, 67 N. W. 1033, 33 L. R. A. 638, says (page 1035):

''There are a number of the questions upon which the court is required to pass when making the preliminary order of incorporation under section 861, Rev. St. which are unquestionably pure questions of fact. Such questions as whether the survey is correct, whether the census is correct, whether the population is as large as the statute requires in proportion to the area, and whether the statutory requirements have been complied with, are all questions of fact; and no reason is perceived why the court may not properly be authorized to inquire into and determine these facts, nor why it may not order an election and appoint inspectors. But the other questions upon which the court is required to pass are of a different nature, and we see no escape from the conclusion that in passing upon and deciding them the circuit court deter-

mines legislative or political questions. These questions are (1) whether the lands embraced in the petition ought justly to be included in the village, and (2) whether the interest of the inhabitants will be promoted by such incorporation. Furthermore, the provision authorizing the court to enlarge or diminish the boundaries of the village as justice may require seems to us equally an exercise of legislative power. It is vigorously claimed by the respondents that these last-named questions are in truth questions of fact only, but it seems to us that this claim is utterly untenable. There is no proper sense in which they can be said to be questions of fact. They are rather ultimate conclusions from all the facts. Given all the facts which the legislature require,—the area, the population, the census, the map, the notices,—and does the order calling an election follow? By no means. The circuit court, in addition to determining these facts, must then say whether, in its judgment, it is best that there should be a village. This is no true question of fact. It is a mental conclusion, which may be based alone on the previous bias of the mind of the presiding judge as to the expediency of a small settlement assuming corporate powers and obligations. A circuit judge could prevent the formation of a single new village in his entire circuit, notwithstanding every requisite condition of fact were present, simply because he believed that it was really best for small communities to remain unincorporated. It is very plain to us that this belief or conclusion of mind of the circuit judge is not a future event or fact or state of facts upon which a law may be properly made to depend. The sum and substance of the law is this: Villages may be incorporated if the circuit court thinks best. This amounts to nothing more nor less than the vesting in the circuit court of the powers of a third house of the legislature, which must be exercised in the affirmative before a village can exist. The legislature has passed the law, the governor has signed it, and it has gone on the statute book, but the circuit judge in every case must add his concurrence before it is operative. The question as to whether incorporation is for the best interest of the community in

any case is emphatically a question of public policy and statecraft, not in any sense a judicial question; and in attempting to submit that question to the decision of the circuit court the legislature has undoubtedly done that which the Constitution forbids.  If the decision of that question is to be delegated to any officer or body, it must certainly be to the county boards of supervisors.  That part of the section also which places the whole question of the boundaries of the proposed village under the control of the court is equally objectionable.  This also vests in the court, without appeal, the decision of the entire question as to what territory, and consequently what people, shall comprise the new village.  Here, again, the court must decide the question of political expediency, which is very plainly a question to be decided by the legislative branch of the government alone.''

The decision of the Supreme Court of Kansas, in the case of *In re Ruland,* 120 Kan. 42, 242 Pac. 456, is particularly enlightening.  In that state the court had, in the case of *Callen* v. *Junction City,* 43 Kan. 627, 23 Pac. 652, 7 L. R. A. 736, held that the exercise of discretion by the court, under a statute very much similar to ours, was a judicial act, and that the statute was, therefore, constitutional, and reaffirmed this decision in several cases.  These decisions created a great deal of criticism in the state of Kansas, so much so in fact that one of the trial judges of the state refused to act when a petition for the extension of the boundaries of a city was presented to him, and a *mandamus* was brought to compel him.  *City of Emporia* v. *Randolph,* 56 Kan. 117, 42 Pac. 376.  The court, after reviewing its previous decision, said (page 459):

'' 'We think it best to follow these authorities, *notwithstanding we cannot assent to the reasoning upon which they are founded.*' '' (Italics ours.)

But the question arose again, and finally the court pointed out the true distinction between acts of the

court which were judicial, and those which were legislative in their nature when the ultimate question involved was the increase or decrease of corporate limits of a municipality, in the following language (page 460):

"Without quoting at length from the authorities, the correct legal principles deducible from them governing the territorial boundaries of municipal corporations may be thus stated: (1) The power to create municipal corporations, including the power to designate their boundaries and to increase or to decrease their corporate limits, is purely legislative—it is not a part either of the executive or judicial branches of the government. In the absence of constitutional restrictions the Legislature may exercise this power at will, as was frequently done in our territory prior to the adoption of our Constitution. (2) Under a Constitution such as ours that legislative power must be exercised by a general law. (3) In so far as such general law requires the exercise of the discretion of someone in order to effect the creation of a municipal corporation, or the increase or decrease of its territorial limits, such general law must vest such discretion in some board or tribunal having legislative functions—such as the board of county commissioners. Section 21, art. 2, Const. (4) But, in so far as such general law makes the organization of municipal corporations, or the change of their territorial limits, to depend upon specific questions of fact, such as the number of inhabitants, the amount of taxible property, the consent of a specific portion of the inhabitants, or electors, or taxpayers of the area affected, the trial of the questions whether such required facts exist, and the making of findings as to whether they do, or do not, exist, and rendering judgment thereon, is a judicial function properly referred to and determined by the courts. (Citing cases.)

"The case of *Town of Olsburg* v. *Pottawatomie County,* 113 Kan. 501, 215 Pac. 451, well illustrates the difference between legislative and judicial functions in the matter of organizing or changing the boundaries of municipal corporations. That case involved

the proceedings before the board of county commissioners for organizing a city. The statute required the board of county commissioners to find, before the city could be organized, four things: (1) The number of inhabitants in the territory proposed to be incorporated; (2) that the petition for incorporation was signed by a majority of the electors; (3) and by a majority of the taxpayers; and (4) that the prayer of the petitioners is reasonable. The first three of these were held to be questions upon which a court could take evidence and determine the facts, and hence to be judicial questions. But the question whether the prayer of the petition is reasonable was held to be. a legislative question over which the court has no jurisdiction. Such a question is really one of statecraft, and involves in a broad way all the political questions of general welfare incident to legislative action.

"In the statute before us there are no specific questions of fact capable of being averred in issuable form upon which a court could hear evidence and reach a conclusion in which he would be guided by the statute, such as density of population, assessed value, or the wish of the inhabitants or taxpayers. By this statute the court is asked 'to hear testimony as to the advisability of making such addition.' Naturally such testimony, having no specific fact to which it is required to relate, would vary with various witnesses, depending upon their respective ideas as to government, statecraft, politics, religion, education, and social and financial matters, and might be influenced by personal or selfish motives. The statute further provides, if the court 'shall be satisfied that the adding of such territory to the city will be to its interest, and will cause no manifest injury to the persons owning. real estate in the territory sought to be so added,' an order shall be made, etc. Obviously, no force is added by stating this in the affirmative as to the city and in the negative as to the property owner, for in determining whether the proposed action is to the interest of the city the court must consider whether such action would be to its detriment, and in determining whether such action will cause no manifest injury to the owners of

real estate the court must consider whether it is beneficial to them, and all this is included in the question whether the proposed action is advisable, which, as we have seen, is a purely legislative question."

We might multiply these decisions many times, but it seems to us their reasoning is unanswerable.

It seems to us that a great deal of the diversity of opinion on this question is caused by the failure of some of the courts to apprehend the true meanng of such words as "justice, injustice, equity, interest of the inhabitants, ought" and other phrases of a similar character, when they refer to the consideration which shall finally govern the court in determining whether the order of annexation shall be made. On careful examination, it is obvious that these words may be, and frequently are, used in two different senses. When an application is made to the sense of justice, injustice, equity, and public interest of a legislative body, they all refer to *moral* considerations which should govern the action of that body, but which do not *compel* it to act in any particular manner. To one member of the legislature, a certain thing may seem just and equitable and in the interest of the public, and he may think that the legislature "ought" to pass a law carrying out those principles. Another legislator may take an absolutely contradictory view of what justice, equity, and the public interest require the legislature "ought" to do, and we cannot say that there is an obligation resting upon the legislature to follow the opinion of either one or the other. When, however, these same words are applied to the action of the court, the situation is very different. The "justice, equity, or public interest" which a court acts upon and enforces by its decree are specifically limited, pointed out and defined by law, and the court may not use its own opinion as to what good morals, social conditions, or political expediency requires, but

must follow the dictates of the law as to what constitutes justice, equity, and public interest, although the judge, *as an individual,* may think the law is absolutely unjust, inequitable, and against public interest. Time and again have we said, in substance, that we believed a certain law was unjust, inequitable, and did not serve the public interest, but we have always added that these are questions to be determined by the legislature, and not by the courts. In other words, the courts enforce *law* and not *moral principles,* which is a judicial act, while the legislature presumably *makes* laws *based on moral principles,* which is an exercise of the legislative power. The courts which have taken the plaintiff's view of the law have insisted that the courts may apply moral, and not legal, principles to their actions.

It may be claimed that our decision will prevent municipalities from extending their boundaries when public interest and the general welfare require it. This does not follow. If the legislature decides that the general welfare requires the annexation of territories to municipalities whenever certain conditions exist, it may, by a general law applicable to all cases where the prescribed conditions are found, declare that annexation shall be made, and the courts will enforce the legislative mandate. The legislature is the sole judge of what these conditions shall be, limited only by the prohibitions of the Constitution. This is the rule declared by the real sovereignty, the people of Arizona, speaking through their Constitution, and this is the rule which all departments of our government must follow.

We, therefore, conclude that, in so far as the legislature delegates to the courts the right of determining the existence of certain facts stated by the legislature to be essential to the addition of territory to a municipality, the function of the court is judicial

and properly exercised, but in so far as its ultimate action is made to depend upon unfettered discretion as to whether politically and economically speaking, it is advisable that the annexation be made, such function is purely legislative in its nature and, impliedly at least, vested by our Constitution exclusively in the legislative department of the government, and cannot be delegated to the judicial department.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER, C. J., and ROSS, J., concur.