**CITY OF ST. JOSEPH, a municipal corporation, Plaintiff-Respondent,**

v.

**William A. HANKINSON et al., Defendants,**

**Ned Carnes et al., Defendants-Appellants.**

No. 45803.

Supreme Court of Missouri, Division No. 2.

March 10, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied April 14, 1958.

Ronald S. Reed, St. Joseph, Lewis F. Randolph, Lewis F. Randolph, Jr., Randolph & Randolph, St. Joseph, for appellants Ned Carnes et al.

Culver, Phillip, Kaufmann & Smith, W. H. Utz, Jr., Francis Smith, St. Joseph, Francis Pickle, J. B. Steiner, St. Joseph, for respondent.

Joseph M. Garvey, St. Joseph, for intervenor, James M. Queen.

EAGER, Judge.

This is an action filed by the City of St. Joseph pursuant to § 71.015 RSMo, V.A.M.S. (1957 Cum.Supp., Laws 1953, p. 309); therein it seeks a declaratory judgment authorizing it to proceed as otherwise authorized by law in the annexation of described territory. The action is a class suit, and approximately 75 individuals, residents of the area proposed for annexation, were named as defendants; these defendants were selected from different parts of the proposed area. Thereafter several hundred others were permitted to intervene in groups, and they became parties defendant; the several groups filed answers. The petition sets out in much detail various statistical, historical and economic facts concerning St. Joseph, past and present, its municipal departments and services, its utilities, the nature, development and population of the area proposed for annexation, certain facts concerning the employments of its residents, and the municipal services which plaintiff proposes to furnish to the unincorporated area, all generally in compliance with § 71.015, supra. Many of these facts will be developed in detail in discussing the evidence. The defendants denied many allegations, and alleged affirmatively the inadequacy of certain municipal services within the incorporated area and the inability of the city to furnish adequate municipal services to the area proposed; they further alleged that a large part of the area proposed for annexation was land used for agricultural and horticultural purposes which was valuable only on account of those uses, and that many of the residents and businesses therein were economically independent of the city. Sundry other defenses were stated, negative and affirmative; the pleadings, pro and con, are amply sufficient to raise all the questions which we shall discuss in this opinion. The trial consumed 37 days and extended over a period of several months; at its conclusion, the trial court rendered painstaking and detailed findings of fact and conclusions of law, and entered a judgment declaring that plaintiff was authorized to proceed with the annexation proposed, in accordance with the statutes "pertaining to annexation by cities of the first class." Joint motions for judgment or in the alternative for a new trial were filed and overruled; thereafter various defendants appealed, both individually and as representatives of the class. We may state here, that while there was a denial in the principal answer of the fact of a proper class representation, that question has now been waived, and the record establishes overwhelmingly the presence of an adequate, and highly vocal, representation; in fact, 91 witnesses testified for the defendants, and the entire record comprises more than 3,400 pages. The trial court found that there was fair and adequate representation. For convenience and brevity we shall hereafter refer to the area proposed for annexation as "the area."

Our jurisdiction depends upon constitutional questions raised by the intervenor James M. Queen, who owns real es-

tate in, and resides in the area. These questions were raised upon his entry into the case and were preserved in his motion for a new trial. The trial court found § 71.015, supra, to be constitutional. Mr. Queen has filed a separate notice of appeal. We shall refer to him as the "intervenor," though the term may be somewhat confusing. Upon being permitted to intervene, Mr. Queen became a defendant, as did the hundreds of other intervenors; indeed, he was actually a member of the class which was originally sued, and to this extent his rights may be broader than those of a true intervenor. He was, we think, entitled to raise any legitimate defenses which came within the general scope of the original suit, and which the original defendants might have raised. Even in true intervention the intervenor may generally do so (39 Am.Jur., Parties, § 79, pp. 950–953; Young v. Pressgrove, 355 Mo. 204, 195 S. W.2d 516), but he may not, by a purported intervention, lug in a different and extraneous cause of action. Pine Lawn Bank & Trust Co. v. City of Pine Lawn, 365 Mo. 666, 285 S.W.2d 679, 685; State ex rel. State Highway Commission v. Hudspeth, Mo.App., 303 S.W.2d 703. In this instance we feel that we should consider the constitutional questions, thus accepting jurisdiction.

■ These are, briefly: that § 71.015 delegates legislative authority and powers to the judiciary and permits the latter to encroach upon the legislative function, in contravention of Art. 2, § 1 of the Constitution of Missouri, V.A.M.S.; that it is vague and indefinite in that it does not provide adequately for a determination of the individual rights of inhabitants and property owners; and that it does not provide the court with specific "authority to annex." A question of due process was pleaded but has not been briefed, and we disregard it. The substantive question is the first one mentioned. For convenience we quote here § 71.015 in full: "Whenever the governing body of any city has adopted a resolution to annex any unincorporated area of land,

such city shall, before proceeding as otherwise authorized by law or charter for annexation of unincorporated areas, file an action in the circuit court of the county in which such unincorporated area is situated, under the provisions of chapter 527 RSMo, praying for a declaratory judgment authorizing such annexation. The petition in such action shall state facts showing: 1. The area to be annexed; 2. That such annexation is reasonable and necessary to the proper development of said city; and 3. The ability of said city to furnish normal municipal services of said city to said unincorporated area within a reasonable time after said annexation is to become effective. Such action shall be a class action against the inhabitants of such unincorporated area under the provisions of section 507.070, RSMo."

■■ It is conceded that St. Joseph is a city of the first class under general law (see Chapter 73, RSMo 1949, V.A.M.S., and State ex rel. Moseley v. Lee, 319 Mo. 976, 5 S.W.2d 83). It is not a constitutional charter city. Thus, the case of McConnell v. City of Kansas City, Mo., 282 S.W. 2d 518, holding § 71.015 unconstitutional as to Kansas City, is inapplicable. The rights and powers of plaintiff to annex territory were granted by §§ 73.030, 73.040, 73.060 and 73.110(43) RSMo 1949, V.A.M.S., and were governed solely thereby until the enactment of § 71.015 in 1953; the city might theretofore annex by ordinance, subject to the requirements and limitations thus imposed. Coming directly to the contention that § 71.015 improperly delegates legislative power, we may concede the general contention of intervenor that the creation of municipalities and other governmental subdivisions, and the extensions of their boundaries, are legislative functions. We also recognize, as have Missouri Courts generally, that strictly legislative powers may not be delegated to nonlegislative bodies, or "bargained away." See, generally: City of Springfield v. Clouse, Banc, 356 Mo. 1239, 206 S.W.2d 539; State ex rel. Field v. Smith, Banc, 329 Mo. 1019, 49 S.W.2d

74; Cavanaugh v. Gerk, Banc, 313 Mo. 375, 280 S.W. 51; Bader Realty & Investment Co. v. St. Louis Housing Authority, Banc, 358 Mo. 747, 217 S.W.2d 489. These cases are cited by intervenor, but on their facts they are in nowise controlling here, nor are they strictly applicable; we need not discuss them. Counsel also cite and discuss certain cases from other states. The scope of this opinion will not permit us to discuss these individually; some will be mentioned. The principle often announced is that if the legislature prescribes the conditions necessary for an annexation, it may delegate to the courts the power to determine whether those conditions exist; and such is a proper judicial function or one of a mixed legislative and judicial nature, 16 C.J.S. Constitutional Law § 139, p. 637; State ex rel. Klise v. Town of Riverdale, 244 Iowa 423, 57 N.W.2d 63; Ruland v. City of Augusta, 120 Kan. 42, 242 P. 456; Udall v. Severn, 52 Ariz. 65, 79 P.2d 347; City of Galesburg v. Hawkinson, 75 Ill. 152; 69 A.L.R. 266, note. The foregoing are the authorities relied on principally by the intervenor; they recognize the general principle just stated, but held, respectively, that the particular delegation of power to the courts in each case was unconstitutional because, under the varying statutes, the court was merely required to determine whether the annexation was "desirable" (Klise), or the "advisability" of the annexation (Ruland), or whether the territory "ought to be annexed" and could be annexed without injustice (Udall), or whether territory "ought to be" detached from the municipality (Galesburg). The gist of the holdings in these and many other cases is that the legislature may not properly delegate to the courts the broad power to determine the political and economic expediency of an annexation, or leave to them a general discretion as to whether the public interest requires the annexation. With that principle we have little quarrel, and it is unnecessary to discuss the cases further. Our immediate problem is to determine on which side of the fence our particular statute falls.

In interpreting this statute we must consider the long line of Missouri annexation cases (some of which will be discussed individually later), and construe it in the light of those cases. The legislature is presumed to have used words in a statute in the light of, and as defined and construed in, the prior adjudicated cases of this court. State ex rel. Northwestern Mutual Fire Ass'n v. Cook, Banc, 349 Mo. 225, 160 S.W.2d 687; Plater v. W. C. Mullins Construction Co., 223 Mo.App. 650, 17 S.W.2d 658; Howlett v. State Social Security Commission, Banc, 347 Mo. 784, 149 S.W.2d 806; Barnidge v. United States, 8 Cir., 101 F.2d 295. For many years prior to the enactment of § 71.015 the courts of Missouri have reviewed the validity of annexation proceedings after they were consummated, usually by suits in equity to enjoin enforcement or by quo warranto, and at least once by a suit for declaratory judgment. Johnson v. Parkville, Mo.App., 269 S.W.2d 775. In so doing, it has been the universal rule that the court does not, in any sense, substitute its discretion or judgment as to the advisability or propriety of the annexation for that of the legislative body of the city, and that it does not review the legislative discretion; its consideration of "reasonableness" is confined to a determination of whether there exists a sufficient showing of reasonableness to make that question, at the least, a fairly debatable one; if there is such, then the discretion of the legislative body is conclusive. State ex inf. Taylor ex rel. Kansas City v. North Kansas City, Banc, 360 Mo. 374, 228 S.W.2d 762; Faris v. City of Caruthersville, Mo.App., 301 S.W. 2d 63; State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393; Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236. The function of our courts, historically, has been merely to determine, in the light of these principles, whether the exercise of the legislative powers has been arbitrary and clearly unreasonable. (See the cases just cited.) Only to this extent do our courts consider the reasonableness of an

annexation. This court thus said in the Mallett case, supra, 62 S.W.2d loc. cit. 397: " * * * 'In short, the court is passing, in a purely judicial manner, upon the validity of an act legislative in its nature.' " However, in so considering the question of reasonableness our courts have laid down in considerable detail the tests, pro and con, to be considered. The case of State ex inf. Major v. Kansas City, Banc, 233 Mo. 162, 134 S.W. 1007 is perhaps still the leading authority in this respect, but see also: State ex inf. Taylor ex rel. Kansas City v. North Kansas City, Banc, 360 Mo. 374, 228 S.W.2d 762, 774; Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236, loc. cit. 248; Bingle v. City of Richmond Heights, Mo.App., 68 S.W.2d 866. The word "necessary," as used in § 71.015, or the "necessity" of annexation, is likewise considered in the cases. In annexation cases, generally, the necessity actually seems to become a part of the "reasonableness." State ex inf. Major v. Kansas City, Banc, 233 Mo. 162, 134 S.W. 1007, loc. cit. 1026; State ex inf. Taylor ex rel. Kansas City v. North Kansas City, supra. In fact, the element of need by the town or city is one of the primary elements listed in our cases as a test of "reasonableness." (See the various cases cited, supra.) And the courts do not attempt to usurp the legislative prerogative of determining the question of necessity.

■ We construe § 71.015 as merely giving to the courts, in advance of a consummated annexation, the same judicial power and authority to test the reasonableness and necessity for an annexation which they have always exercised after its completion; that is to say, to decide whether the legislative declaration by the city is so palpably unreasonable and unnecessary as to be an arbitrary and oppressive exercise of its legislative power. Considered in this light, the change is procedural, and the legislature has not delegated to the courts the power to determine reasonableness or necessity in the first in-

stance, as would a legislative body. We believe that our construction fairly reflects the intent of the legislature. Such a construction is certainly more reasonable than any other when we recall that the general annexation statutes, giving broad original discretionary powers to cities generally, are unrepealed. In our present view the old and new statutes are in harmony. Subsection 3 of § 71.015 requires the allegation of the city's ability to furnish normal municipal services within a reasonable time. That requires merely a finding of facts, pure and simple.

It has apparently not been considered improper for the legislature to delegate to county courts (which then had at least quasi-judicial powers) the right to establish road districts, and to determine whether the land to be included would be benefited. State ex inf. Killam ex rel. Higginbotham v. Colbert, 273 Mo. 198, 201 S.W. 52. And see: Birmingham Drainage Dist. v. Chicago, B. & Q. R. Co., 274 Mo. 140, 202 S.W. 404, involving legislation delegating to the circuit courts the power to create and fix the boundaries of drainage districts. See, also, § 80.030, RSMo 1949, V.A.M.S., which authorizes towns and villages to petition the county court for annexation, and further authorizes that court to hear the evidence and "if it deems it just and proper," to order the annexation. That statute (in substance) has been on the books since 1877, and while it is not in question here, it may be significant that it appears never to have been attacked as unconstitutional, except on the ground of lack of due process, and that was denied (State ex rel. Scott v. Lichte, 226 Mo. 273, 126 S.W. 466). We mention the last cited cases and statutes merely as evidencing a part of our legislative history, and not as in anywise controlling or directly applicable here.

The legislature has, under its constitutional grant of authority to create, limit and restrict cities (Art. 6, § 15), granted to cities of all classes authority to annex territory with varying restrictions (Chap-

ters 73, 75, 77, 79 and § 80.030, all RSMo 1949, V.A.M.S.). In enacting § 71.015 the legislature has simply confirmed the general powers of annexation which already existed, and thereby imposed an additional restriction, procedural in nature and applicable generally, upon the power to annex. This section gives to the courts no power or authority which they did not already have; it merely permits the exercise of this power in advance of the consummated annexation, thus saving, perhaps, numerous complications. It also places the burden of proceeding, and of filing the suit, upon the city; in our opinion it also requires the city to show, prima facie, that the discretionary and legislative powers have not been unreasonably and arbitrarily exercised. To this extent the city must produce evidence of reasonableness, and to this extent the statute places the burden of proof upon the city. Compare: City of St. Ann v. Buschard, Mo. App., 299 S.W.2d 546. In view of our decisions fixing the meaning of the terms used in § 71.015, and the function of the courts, that statute sufficiently lays down the conditions upon which an annexation may proceed; and in continuing to follow our previous procedure in these cases, which we now confirm, our courts will not be required to legislate under this statute.

It is hardly necessary to repeat the maxims that the courts should indulge a presumption in favor of constitutionality (Bowman v. Kansas City, Banc, Mo., 233 S.W.2d 26), that they should faithfully apply to the act its plain and rational meaning in order to ascertain its intent and promote its object (Union Electric Co. v. Morris, 359 Mo. 564, 222 S.W.2d 767, 770), and that statutes should be construed so as to give effect to legislative intent and avoid absurd and meaningless results (State ex rel. Gass v. Gordon, Banc, 266 Mo. 394, 181 S.W. 1016; State ex rel. Moseley v. Lee, 319 Mo. 976, 5 S.W.2d 83). So doing, we are not impressed with the further contentions of vagueness. Counsel suggest that the act does not require the court to find the existence of the facts alleged, or to render judgment on such facts, and that it does not "provide the court with authority to annex the area." The plain, ordinary, and common sense inference from the act is that the court shall proceed, as in an ordinary declaratory judgment action under §§ 527.010–527.140 to try the cause, to make its findings, and to declare the rights of the parties. Indeed § 71.015 specifically incorporates Chapter 527 by reference. The section would be meaningless, construed otherwise. Section 527.020 specifically makes the procedure of declaratory judgment actions available to persons whose rights, status, or legal relations are affected by a statute or municipal ordinance; and that type of action is an "appropriate way of determining the powers and duties of various governmental agencies." City of Joplin v. Jasper County, 349 Mo. 441, 161 S.W.2d 411, 413. There need be no mandatory requirement of a judgment in § 71.015, and indeed Chapter 527 contains none; circumstances may arise making the exercise of the power inadvisible in a given case; but the court is given the "power" (§ 527.-010). We need not discuss the final contention that the act "does not provide the court with authority to annex the area." The court does not now, and never did, consummate an annexation. It merely declares the legislative action valid or invalid. If the court now finds that the required conditions have been met it merely authorizes the city to proceed with the annexation under the general laws applicable to it. It may be worthy of note in passing, that an organization composed largely of persons who are now defendants here, urged the constitutionality of § 71.-015 in an amici brief filed in the case of McConnell v. City of Kansas City, supra, in so far as it was applicable to St. Joseph. We do not mean to intimate that such action is binding upon the intervenor. As interpreted and construed in the light of our established adjudications, we hold that § 71.015 is not unconstitutional for the reasons assigned.

It will be wholly impossible to digest the evidence in any detail. It meticulously presents the opposing contentions, both orally and by hundreds of exhibits. We have stated the basis and function of our right of review in annexation cases, and we shall consider the evidence in that light. No question is raised concerning the adoption or sufficiency of the resolution of annexation, the legal description of the area to be annexed, or concerning any other formal matter.

The proposed annexation includes an area north, east and south of St. Joseph; the Missouri River is on the west. On the north the area does not extend westwardly to the west city limits; on the east and south it envelops the city. The "area" (as we shall hereafter describe it) comprises a total of 8,714.4 acres, as compared with approximately 9,000 in the present corporate limits; roughly speaking, the area extends outward from half a mile to a mile and a half from the present limits. The limits proposed would certainly be no less regular in shape than the present limits; on the south they would be considerably more regular. The so-called "Belt" Highway runs north and south through most of the area, and lies just east of the present limits; this carries U. S. Highways 71, 169, 59 and 136; Highway 275 traverses the northwestern part of the area, and Highway 36 (east and west) traverses the area and forms an important junction with the "Belt." Some of these same highways run through the southern part of the area. Several railroad lines extend through the area in the eastern and southern parts. Proposed new U. S. Interstate Highway 71 has been surveyed to run generally north and south through the area near its eastern limits, with a right of way perhaps 350 feet wide; this would pass through some parts of the area which are probably most truly "rural."

As most of us know, St. Joseph is an old and historic city, as the ages of cities go in the midwest. Its population has varied from 77,403 in 1910 to 80,935 in 1930, 75,711 in 1940, and 78,588 in 1950. The depression undoubtedly had much to do with the loss of population in the thirties. A curious figure of 102,979 appeared as the 1900 census figure, entirely out of line with all others. All concerned seem to suspect some "juggling" in that figure, and we concur, since the statutes of limitations or the grim reaper, or both, have undoubtedly furnished adequate protection for the culprits by now. We shall disregard it in our consideration. It was unofficially estimated at the trial that the present population was 85,000; this was based on post office deliveries and a "census factor," and the figure would seem to justify serious consideration. Bank deposits in the city increased from $97,-773,240 in 1950 to $120,496,350 in 1955; saving accounts (individuals) from $27,-000,000 in 1950 to $40,380,760 in 1955. Bank clearings had shown a constant increase from $186,150,372 in 1941 to $624,-658,706 in 1954. Building permits granted in 1941 totalled $374,190; in 1950, $1,-444,000; in 1955, $5,189,000, and for 10½ months of the 1956 fiscal year, $4,842,000. The number of telephone users, the use of electricity, and the number of water users all showed substantial recent increases. The number of addresses to which mail was delivered increased from 23,037 in 1953 to 25,223 in 1955. In most of these particulars the city had shown a steady growth over a period of years; some, of course, are due to general changes in our mode of living, but a recent population growth is reasonably to be inferred from all these statistics. Defendants introduced evidence to show that there were many vacant lots and tracts within the present city limits, and numerous vacant buildings or parts of buildings in the downtown area. There was no evidence to show how many of the vacant tracts were actually available for building, and there was considerable evidence to show that there were very few tracts within the city of such size and location as to attract any substantial real estate development; some of

those listed were very rough, many were small, some already had developments started, and some were in neighborhoods near heavy industry or railroads, and thus would not attract a substantial type of residential building. Of course, there were and are many isolated vacant lots, as in any city. Some of the supposed vacancies downtown had been filled or were about to be filled at the time of trial, and some of them were in very old buildings. This situation does not impress us as particularly unusual. The evidence showed that some large wholesale houses and other commercial enterprises had left St. Joseph or had ceased business entirely in years past, and also that various new enterprises had come in; it was claimed (and disputed) that this had resulted in a net increase in employment and payrolls, and the trial court found that it had.

We cannot relate in any detail the mass of evidence concerning the status, personnel, and equipment of the fire department, police department, health department, board of public works, etc., without extending this opinion beyond all reasonable bounds. The city has a Class 4 rating with the National Fire Underwriters which, according to the evidence, was higher than that of any other town or city in Missouri except St. Louis and Kansas City. About 1947 there had been some alleged lag in the status of the equipment and morale of the fire department, but additional equipment had since been acquired, a training program instituted, and other improvements accomplished, to the reasonable satisfaction of the underwriters. We find that these various departments of the city are reasonably adequate and capable of expansion. Many of the sewers of the city are old; they have been kept in repair very well, and a $500,000 sewer repair bond issue was voted in 1955; the people have twice defeated bond issues for new sewers, in 1953 and 1955. Defendants complain vigorously that there are certain areas of the city with no sewers, and that there are septic tanks and several hundred outdoor toilets

within the present limits. This, apparently, is true, but the conditions exist in large part where there are no sewers available, and at the homes of people in the most modest circumstances. The evidence shows that the city is working on the problem in good faith. The city has recently procured very comprehensive surveys, reports and maps of its sewer system, of proposed improvements thereto, and of extensions thereof; this work was done by a highly competent outside engineering firm. These reports have been coordinated with the recent "prodding" of all Missouri River cities by the federal government for the establishment of treatment plants for sewage and waste disposal. Several alternate plans for the renovation of and additions to the city sewers were submitted (one to include the so-called stock yards area) at costs estimated from $4,585,000 to $5,806,000, all including a treatment plant. In the same reports it was demonstrated that the establishment of sewers in the "area" as a part of the St. Joseph sewer system was entirely feasible; a map of the proposed extensions was introduced in evidence, and considerable testimony was given; some extensions could be connected to the city sewers immediately upon construction. The cost of the first phase of sewer construction in the "area" was fixed at one million dollars, consisting of main sewers to serve all of the more populous areas; the second phase, to await further development, was estimated to cost $500,000.

The city receives its electric power and water from private utilities. They are already serving the area wherever sufficient need has developed; the evidence shows, beyond question, that they are capable, physically and financially, of extending their services into the area wherever needed. The city may order the extension of water mains to serve fire hydrants and the installation of fire hydrants within its limits, paying on an annual rental basis. The offices of these utilities are in the city, they pay substantial city taxes, and to a

certain extent they are regulated by ordinances; generally, they are subject to the orders of the Missouri Public Service Commission. The city has approximately 216 miles of streets, exclusive of boulevards and parkways; of these the great majority had been paved, some were "rocked" or oiled, and 25 miles were dirt; the evidence was that the dirt streets were expected to be eliminated entirely by April of 1957. The city has a comprehensive Zoning Code, based on a form very generally recommended and adopted. Garbage is collected by a contract hauler who is compensated from a tax levy of 15 cents per $100 valuation. Considerable complaint was made by defendants that the garbage is dumped into the river, but that is hardly within the issues of our case; and presumably the practice must and will be stopped by federal regulation within the forseeable future. The city is served by 6 railroads, by bus lines and by one commercial airline; the stations are within the city, except for the airport, which is across the river but is owned by the city. The city owns and maintains 21 parks, a municipal golf course, 14 recreation centers, 2 swimming pools, a public library with two branches, a museum, a stadium and a football field. These are patronized generally by residents of the "area" as well as of the city itself; this is also true of many of the city churches, hospitals, theaters, department stores and shops.

The "area," as stated, consists of approximately 8,741 acres, slightly less than 14 square miles. Of this area 788 acres are owned by the county or state and used for public purposes. The population is estimated at about 6,800 persons, with a population density of .8 of a person per acre; this is approximately 20 times the density of the average northwest Missouri rural county. In the area are 68 recorded subdivisions containing a total of 2,726.7 acres; some are very old, some new; some of these were never developed, but many have been. It was stated that the area contained 2,141 residences in 1954,

272 of these having been built between 1950 and 1954. One exhibit is a large map showing the distribution of population, by dwelling units; another shows commercial use locations. The development is generally greater bordering on and extending out from the present limits, but in various places it extends pretty well through the area, particularly in the south half. It was shown from the card record system of a public utility that of the heads of households in the area, 1,292 (about 59%) were employed in the City of St. Joseph, 304 (14%) were employed in the packing house district, 402 (18%) were self-employed outside the city, 110 were widows or pensioners, and 81 were either unemployed or the houses were vacant. Various streets of the city extend into the area, particularly on the east and south; we should judge that this is true of perhaps 20 or more streets. Considerable residential building is located on these streets of the area, and most of the addresses are shown by street and number. Two hundred and nine commercial businesses are located in the area, by actual count; these include various restaurants and cafes, grocery stores, grain and feed stores, nurseries, many motels and very many filling stations, several heavy equipment sales and service places, garages, trailer parks and sales, taverns and night clubs, greenhouses, two large research or experimental farms, three drive-in theaters, a skating rink, liquor stores, dog kennels and several veterinary offices and facilities, used car lots, implement sales, an egg purchasing station, a seed store, supermarkets, a sheet metal shop, hot dog, root beer and ice cream stands, an electric service shop, several welding shops, livestock sales and feed barns or lots, furniture sales, a hardware store, two feed mills, television sales and service, a locker plant, a hatchery, poultry purchasing and processing plants, a pony farm, the Dannen Elevator, storage buildings, barbershops, a lumber yard, a beauty shop, appliance sales, auto repair shops, a radio studio and tower,

and undoubtedly others. There were 324 electric customers in the area who were not on the domestic rate, and 276 business telephones; the number of electric users had increased by 108 from 1954 to 1955, an increase of 5.3%. Electricity is now available over the entire area and city water in those parts which are sufficiently developed, comprising a large part of the area. There is no zoning in Buchanan County outside of the city, and as seen from the foregoing list of commercial enterprises, there is a considerable conglomeration of activities in this area; much, of course, is concentrated along the highways. There is no fire protection except by a volunteer department in Industrial City, an old unincorporated settlement about half a mile north of the present limits, and by the voluntary service now rendered by the city fire department on call. The area is policed only by the sheriff's force and by Troop H of the Highway Patrol; the latter is concerned chiefly with the state and federal highways intersecting the area, and its 35 men serve 15 northwest Missouri counties. The sheriff has only two deputies for duty in patrolling the entire county but with 4 in service between 11:30 p. m. and 1:30 a. m. There is no general or regular inspection of food handlers or of places serving food in the area, except for an occasional visit by personnel of the State Health Department, which maintains no staff for inspections of private commercial establishments or housing except upon request or complaint; there is no such service by the county. The State Health Department had run two spot inspections on some of the food-handling places in this area from November, 1955 to January, 1956. The field man who made these inspections rated the over-all condition at 55%, whereas the minimum for approval should be 80%.

The roads and bridges in the area are now miantained by the county with some financial help from the state under the King Road Bill. The county owns and operates considerable heavy equipment in that work.

The county engineer testified that he did not believe that the city could adequately maintain the streets of the city with the added burden of the streets and roads in the area. The trial court found that it was not shown that this witness had the knowledge and experience necessary to qualify him on this subject, and gave credence to the evidence of the city that, with certain additional equipment which it proposed to purchase, it could improve and adequately maintain these streets and roads.

There is no substantial doubt that most of the land in the area is adaptable to city or urban uses, either residential, commercial or industrial. Some of it is rough, but that part is better adapted to residential building than to farming, according to modern authorities. The most serious question in the case stems from the contention that this area is largely agricultural in nature and use, and of value as such. An enormous amount of testimony was taken on this phase of the case, including specific testimony by dozens of property owners concerning the nature and use of hundreds of specific tracts; there was no testimony that we recall concerning the actual value of any of the land for strictly agricultural purposes. We must confess that we have been more or less lost in the maze of individual and highly detailed testimony regarding specific tract uses; we must rely to a substantial extent on the compilations of those qualified witnesses who examined the area minutely and prepared and presented statistics concerning the tract sizes, uses and other pertinent data. The defendants apparently take the view that every tract on which people reside and keep a few chickens, raise a garden, and perhaps pasture a cow or raise a pig or two, is necessarily to be treated as agricultural in nature. We are convinced that on most small tracts of this nature the head of the household has an outside job upon which he relies for support, and that he simply tries, in this manner (and commendably) to cut down his family expenses. The plaintiff, on the contrary, has insisted that only those tracts

which can be economically operated as farming units for the support of a family should be considered as agricultural in nature. We probably do not need to go to either extreme. Pertinent, however, are the following findings of the trial court as to tract sizes and numbers in the area:

| 1 Acre | 1–5 A | 5–10 A | 10–15 A | 15–40 A | over 40 A |
|--------|-------|--------|---------|---------|-----------|
| 347 | 237 | 118 | 58 | 74 | 14; |

also, that 89.6% of the area was in tracts of less than 15 acres, with only 10.4% in tracts over 15 acres. Prof. O. R. Johnson, head of the Department of Agricultural Economics at the University of Missouri, who had made many farm appraisals, made a detailed examination of the area by quarter-sections, and testified at length from extensive notes and from aerial photographs of each respective quarter-section, considered individually. He had studied the land, the buildings, the crops, and the livestock. He testified generally that small tracts could not be operated economically as farms with modern equipment; that while, in the broadest sense, perhaps 3,000 acres were used in some form of crop production, only about one-third of that acreage could, in his opinion, actually be operated as low-cost production land, or as successful farming ventures; this one-third was scattered over the area; on the remaining two-thirds, the costs would be prohibitive. In these calculations he included all the small tracts. As we understand it, he did not deny that one might eke out a living on some of the comparatively small tracts, furnishing all the labor himself. Much of the land in the area was badly eroded, there were numerous gullies or draws, some was only woods, and a great deal of it was rough. Basically, the soil was good, where not wasted away. In his calculations he excluded greenhouses, nurseries and experimental farms as commercial uses and also the land which was publicly owned. He found many homes on tracts of 2 to 10 or 12 acres with perhaps a garden, chickens, and a cow or two to supplement the owners' outside income. He found very few tracts which he considered were being operated as true farming units.

He found a number of substantial dairy farms, as usual in the outskirts of a city, but these did not necessarily depend upon the crops or roughage grown on the place. A representative of the U. S. Stabilization and Conservation Administration testified that few people in the area cooperated on crop allotments or used his agency; it had listed as farms all tracts containing 3 acres or more, whether the owner cooperated or not and even if the owner had outside work. It listed a total of 806 "crop acres" in the area, privately owned, including the two research farms. It was the opinion of this witness that the farms in the area had been, and were generally being, split up into smaller tracts, whereas the tendency in the county generally was to increase the size of operating farms by the consolidation of tracts. The trial court found that there were approximately 806 acres in the area which were suitable and adaptable for agricultural purposes, exclusive of public land. We think there is somewhat more.

Much testimony was adduced of land values in the area; most of this came from a well qualified real estate man who had been actively engaged in business in St. Joseph for 40 years. We have examined and re-examined this evidence in view of defendants' insistence that much of the evidence was stricken as hearsay, and we use herein only such evidence as remained unquestionably available, either as based on sales personally made or on valid opinions of the values of land which the witness had inspected. The evidence fairly shows that values in the area, on an acreage basis, varied from $300 per acre in the extreme north, to (at least) $1,500 an acre on the sale of a five-acre tract near Highway 36; much of the land still in acreage tracts and lying in widely different parts of the area, was valued at prices ranging from $350 to $500 an acre; some had been sold at such prices. One twenty-acre tract east of the Belt sold for $20,000, and another 20 acres on Highway 36 for $18,000. Lots in various additions were valued and sold at prices considerably higher, such as $600 to $800 for

100 foot lots, or for one-third or one-half acre tracts. The land along the Belt was held generally on a front foot basis; one tract of 2½ acres had been sold at $25 per front foot (or $7,500), and the evidence indicated that the fair value of some was $30 per front feet. Land along Highway 71, City Route to the south, was valued at $10 per front foot. These valuations appeared to be fairly representative of the area generally. Practically none of the defendants chose to testify on land values. This witness (Mr. Barrow) was of the opinion that the "great preponderance" of land in the area could no longer be considered as farm land, and that it was not now even considered as such by the owners, but was held for development or city uses. This view was corroborated by the testimony of at least two or three landowners themselves. We conclude that the value of land generally in the area is substantially greater than any possible value it may have for farm uses.

We look now to what the city proposes to do for the area if it is annexed. This we take largely from the testimony of the Mayor and of department heads or representatives. These persons have no guaranteed tenure, but they are the only individuals who may speak with some authority. The city proposes to extend police protection to the area immediately on a temporary basis, with the present personnel and equipment; it would then add additional personnel and acquire additional equipment, revise the arrangement of police districts and assign both traffic officers and squad cars to the area. These provisions seem adequate and within the range of the city's financial ability. The city would immediately begin to answer all fire alarms from the area as an obligation rather than as a courtesy, as it is now doing. Its pumper trucks carry 200 gallons of water, which, with high-pressure fog nozzles are said to be adequate to extinguish the average fire, even without water mains available. This equipment is also able to draw water from wells, cisterns and ponds. Upon annexation the fire in-surance rates in the area would automatically drop one class, from 10 to 9; further reduction would depend upon the facilities afforded. The city proposes to build one new fire station in the area near the intersection of the Belt and Highway 36. This would bring substantially all of the area within 3 miles of a fire station, and much within 2 miles; the extension of water mains and the installation of fire hydrants, as already laid out in detail, would place all property so protected in a rating somewhere between classes 4 and 9. This would afford effective protection to the areas most densely populated and developed. The Mayor states that the city now has on hand sufficient available money from a bond fund to build the new station; it has been purchasing at least one new truck or pumper each year and it would assign one of these new pieces of equipment to the new station and employ there additional personnel. The city proposes also, as indicated above, to order the extension of water mains where deemed necessary and advisable, and the installation of approximately 63 new fire hydrants. The latter are paid for on an annual rental basis. The water company expresses its ability and willingness to comply; naturally these facilities will not be extended over the entire area at once.

The city proposes to purchase additional equipment and employ additional men for its Board of Public Works in order to take over, improve, and maintain the streets and roads in the area. It seems reasonable that it will be able to do so. That department would also furnish promptly all engineering services necessary to establish the grades and locations of streets and sewers, and to co-ordinate these; and also to make any necessary study of subdivisions, actual or proposed. It is also proposed that an over-all plan of the streets be laid out so that connections will be afforded between all parts of the area, as well as connections with the city streets. Street lighting in the area will probably require a bond issue, amounting to approximately $131,400; a detailed plan for this has been prepared.

The Health Department proposes to begin immediately the inspection of food handling establishments in the area, without additional inspectors; it also proposes to abate certain "nuisances" in the area, as shown in the evidence, which presumably include the verified pollution of certain small streams or creeks; it would require trash and refuse to be hauled to the city's dump, more politely described as a "sanitary fill." Garbage collections would be instituted promptly by the contract hauler and financed by tax levy as in the city. Inspections are also proposed of sanitation in trailer courts, and of plumbing on new construction. Building inspection would begin immediately on new construction under the city's ordinances. The Mayor states that he proposes to appoint promptly a commission, which will include residents of the area, to make a thorough study of zoning problems in the area, and to make recommendations for a comprehensive zoning ordinance (or an amendment to the present ordinance). A comprehensive zoning scheme will undoubtedly be enacted for the area without undue delay.

It is the Mayor's expressed intention to submit to the people a bond proposal for one million dollars to finance the first phase of sewer construction in the area, plus the additional capital outlay for street lighting, as already discussed. Defendants attack this suggestion as an idle gesture, stating that the people have twice defeated bond issues for new sewers in the city. That is true, but we cannot speculate that because of this all future bond issues will fail. We all know of bond issues which have been successful after being defeated two or three times. It seems perfectly apparent that, within the foreseeable future, the federal government will force St. Joseph and all other Missouri river cities to cease the dumping of raw sewage into the river and to construct treatment plants, however financed; the engineering plans which have already been submitted include not only the treatment plant, but a renovation of the city sewer system. If the people of the city in the future approve such a plan, as it seems they must sooner or later, it would not seem to be unreasonable to assume that they would also approve the area extension, although the two are not necessarily connected. As far as we are concerned we are unwilling to condemn the proposed annexation upon our speculation or counsel's speculation that the people will not approve the area sewer extension, even as an independent proposition. The bonding authority of the city, even on the basis of its present assessed values, is far greater than the limits which will be required by the bonds now proposed.

The factors to be considered by the courts in reviewing annexation proceedings are set out at length in State ex inf. Major v. Kansas City, Banc, 233 Mo. 162, 134 S.W. 1007, State ex inf. Taylor ex rel. Kansas City v. North Kansas City, Banc, 360 Mo. 374, 228 S.W.2d 762, Johnson v. Parkville, Mo.App., 269 S.W.2d 775, and in other cases. We merely refer to them here, without repeating them specifically. The affirmative factors favoring annexation need not all be present in the same case. Dressel v. City of Crestwood, Mo. App., 257 S.W.2d 236. Each case is a separate problem to be considered on all its facts. We must never lose sight of the fact that the court, now, as well as prior to the enactment of § 71.015, is only considering the reasonableness or unreasonableness of the exercise of the council's legislative discretion in enacting the ordinance or resolution. It will not be our function here, if indeed it is ever proper, to say that the council might have more reasonably exercised its discretion if it had taken in less land and had excluded some of the outlying areas. In State ex inf. Mallet ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, 397, the court said, quoting with approval from the Major case: " 'It is no province of the court to substitute its own judgment of what would be the best or most advisable line for the extended limits; it is not its province to subtract or add to the territory selected by the municipality to

be annexed; its sole duty is to examine the extension as actually attempted and to say whether it should remain. * * *'" We examine the extension as actually enacted.

We must make our own findings and conclusions, whether this proceeding under the statute is strictly in equity or not (§ 510.310, RSMo 1949, V.A.M.S.). And it is peculiarly appropriate here that we afford considerable deference to the very careful and painstaking findings of the trial court. The proposed area is all contiguous to the present city; it lies in one continuous band around three sides of the city. Its boundaries do, in some degree, make the limits of the city more regular. Substantial parts of this area are now platted "and held for sale as town lots"; we may fairly infer from the land values that other parts, unplatted, are being held "to be brought on the market and sold as town property" when the owner's price is attainable, even though few owners so admitted. A substantial portion of the area consists of densely settled communities, and these are well scattered over the area, except along much of its eastern fringe. A substantial number of the streets of the city extend into the area with little or no line of demarcation. It seems clear to us that many residents of St. Joseph have been using substantial parts of this area "to supply places for the abode or business" of themselves (Major case, 134 S.W. loc. cit. 1022); it also seems clear that a large part of the population of the area (6,800) has moved there to be in suburban surroundings, and because there is more and better land available there for substantial new residential development; to this extent, at least, the development there is an actual "growth" of the city. We are not impressed (as an opposing factor) with the suitability and availability of vacant land within the present city for substantial and new residential development. As further evidence that much of the development in this area represents the actual growth of St. Joseph, we call attention again to the evidence concerning the employments of

its people. Much of the land in the area, if not indeed all, is adaptable to town uses, and valuable because of this. We think it may well be that St. Joseph should have a voice in policing this area which is growing up in such a miscellaneous fashion on its doorstep; this applies both to a physical policing of the area and to having a voice in its orderly growth and zoning. There will never be a time in the future when control will not be rendered more difficult because of continued further development. We believe the city needs some of this land now for residential development, and that it will need more in the future; probably this is also true of some forms of commercial development, particularly those requiring extensive areas. All of the foregoing factors are among those universally held to favor annexation. "Sometimes one factor alone is of importance; sometimes several combine their weight to determine the matter." State ex inf. Major v. Kansas City, Banc, 233 Mo. 162, 134 S.W. 1007, 1022. In the case of Mauzy v. City of Pagedale, Mo.App., 260 S.W.2d 860, loc. cit. 864, the court said: "In fact, there can be no hard and fast rule laid down for determining the reasonableness of a proposed extension; and a case of reasonableness is made when it appears that the land annexed is so situated as to be adapted to urban purposes, and as to be necessary or convenient to a proper exercise of the city government, even though a portion of the land may be as yet undeveloped or in use for agricultural pursuits."

Annexations should be infrequent. St. Joseph has had no substantial annexation in many years. And a city may, to a reasonable extent, look to its future needs in planning and making an annexation. Counsel for the city call our attention to many similarities in the facts here with those in State ex inf. Taylor ex rel. Kansas City v. North Kansas City, Banc, 360 Mo. 374, 228 S.W.2d 762. There are many, it is true, and we refer those interested to that opinion; but there are also dissimilarities. The growth of Kan-

sas City had been much more rapid and its need was somewhat greater. That opinion, however, lends much weight to plaintiff's general position here. The most substantial argument against the present annexation is that the land to be annexed is in large part agricultural. This has given us pause. This court, however, said in State ex inf. Major v. Kansas City, Banc, 233 Mo. 162, 134 S.W. 1007, at loc. cit. 1023: "* * * If land near a city is being held for prices far above any rural use, and men in that city are willing to pay for it prices far in excess of any rural use, that land is as fairly within the future development of the city as the judgment of those who are most interested can place it." We find that much of the land claimed here to be agricultural lies in small tracts, on which people live while working at some vocation in the city or elsewhere; some of these people commendably decrease their living expenses by tending a garden, keeping chickens, and perhaps pasturing or feeding a little livestock. This practice is not confined to tracts of only 2 or 3 acres; it certainly extends to much larger tracts. We are impressed with the testimony that probably not over 1,000 acres (possibly 13%) of this area consists of land which is or can be operated economically as successful farms, excluding the public land and two tracts which are primarily commercial operations; the trial court found that slightly over 800 acres of the area were suitable and adaptable for agricultural purposes. We would extend that figure somewhat. But even should we increase our acreage and percentage figures substantially it would not be fatal to this annexation. In the Taylor case, supra, this court said (228 S.W.2d loc. cit. 777): "* * * It is strongly urged that the inclusion of this so-called farm area within that entire area relator proposes to annex, of itself renders relator's entire proposed annexation unreasonable and invalid. This particular area is about 20% of relator's proposed total annexation area. It is now sparsely settled and needs highways. Some

of this area is comparatively rough land, but much of the area has a quite high value. It has that value not because of its present country use but because of its prospective town use. In the Major case, supra, [233 Mo. 162, 134 S.W. 1025], respecting relator's 1909 annexation, we said, '* * * nor does it matter that a considerable part of the land is at present used for agriculture; as its value is derived from its prospective town use, and not from its present country use, it might properly be included within the city.' * * *" And see Faris v. City of Caruthersville, Mo. App., 301 S.W.2d 63. The author of that opinion held, and we agree, that the mere fact that land is being used for agriculture and that it has a value as such, does not necessarily and automatically prevent its annexation. In the absence of express statute, we think that such use is only one of the many factors to be considered as to the reasonableness of the annexation, although it is a highly important factor. And see State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, to the effect that land, though used for agriculture, may lose its character as such when it attains a value far in excess of its real agricultural value, and thus become subject to annexation. In certain respects this area now has many of the advantages of the city; this is a factor to be considered. We have also considered in this opinion the following cases, whether discussed or not. Bingle v. City of Richmond Heights, Mo.App., 68 S.W.2d 866; Waller v. City of Macon, Mo.App., 277 S.W.2d 886 (with many similarities to our case); Mauzy v. City of Pagedale, Mo.App., 260 S.W.2d 860; Williams v. City of Illmo, Mo. App., 279 S.W.2d 196; Seifert v. City of Poplar Bluff, Mo.App., 112 S.W.2d 93; Johnson v. Parkville, Mo.App., 269 S.W.2d 775; City of St. Ann v. Buschard, Mo.App., 299 S.W.2d 546, and City of Sugar Creek, Mo., v. Standard Oil Co., 8 Cir., 163 F.2d 320.

The finances of the city were discussed and explained in great detail. We

conclude that the city will be able to finance the services which it proposes to furnish and within a reasonable time. It would further encumber the record without any compensating advantage to set out all the figures. Throughout the trial counsel for the defendants complained of the failure of the city to annex the so-called stockyards district, containing the packing houses. As said in the case of Seifert v. City of Poplar Bluff, Mo.App., 112 S.W.2d 93, loc. cit. 96: "* * * we are not concerned about territory omitted or why it was omitted." Such an element can only be considered in determining whether the annexation, as presented, was arbitrary and unreasonable; it can be of no controlling effect here.

In the last quarter of a century the automobile has changed vastly our scheme of living and our places of abode. It has made such problems as this more or less commonplace. The city has made an intensive investigation of this annexation for a period of several years; it has not been a hasty scheme. The proceeding can hardly be viewed as a "tax grab," for the expense of furnishing municipal services to the area will largely consume the increase in tax revenue, and may exceed it, for all any one can definitely foresee. It is fair to assume that this area will be developed much more rapidly if normal municipal services are furnished to it; this is particularly true of sewers. The plaintiff should not be penalized because its growth in years past has been slow, if its present prospects are based on realities; this may be the incentive it needs. And it is apparent that it has been steadily losing some of its residents to the beckoning call of this new area of population. There are many ties, social and business, between the people of the area and the city.

We conclude that plaintiff has sustained its burden by proving that the reasonableness of the proposed annexation was at least a debatable question upon which the city council might exercise its discretion, and that this discretion has not been arbitrarily exercised. We may not substitute our judgment now. The judgment and order of the trial court authorizing the city to proceed with the annexation will be affirmed. It is so ordered.

All concur.