**CITY OF MEXICO, a Municipal Corporation, Plaintiff-Respondent,**

v.

**Thomas M. and Jo Ann HODGES et al., Defendants-Appellants.**

**No. 34110.**

Missouri Court of Appeals, St. Louis District.

June 20, 1972.

**546**

Warren D. Welliver, Columbia, M. E. Stokes, St. Louis, Edwards, Seigfreid & Runge, Mexico, for defendants-appellants.

McQuie & Deiter, Montgomery City, for plaintiff-respondent.

DOERNER, Commissioner.

The City of Mexico brought this action under what is commonly termed the Sawyer Act, § 71.015, RSMo 1969, V.A.M.S., to obtain a declaratory judgment authorizing it to annex adjacent land. The trial court entered the judgment sought by the City, and after unavailing post-trial motions this appeal followed.

In its petition the City alleged, as required by § 71.015, that the annexation was reasonable and necessary to the proper development of said City, and that the City had the ability to furnish normal municipal services of said City to said unincorporated area within a reasonable time after said annexation was to become effective. The trial court so found, and the sole point

urged on appeal is that the evidence was not sufficient to support the court's findings.

■ In one of the earlier cases construing § 71.015, City of Olivette v. Graeler, Mo., 338 S.W.2d 827, 836, it was said that the provision therein, "* * * 'That such annexation is reasonable and necessary to the proper development of said city.' * * *":

"* * * embodies two separate but closely related concepts; that is, (a) that the annexation is reasonable, and (b) that the annexation is necessary to the proper development of the city. The plain language of the provision makes evident the legislative intent. To say that the annexation must be 'reasonable * * * to the proper development of said city' is confusing and tends to preclude a judicial inquiry into the reasonableness of the annexation from the standpoint of the area to be annexed. Both parties are entitled to the test of reasonableness. City of Fulton v. Dawson, Mo.App., 325 S.W.2d 505, 516[3, 4]. To hold otherwise might render the Act vulnerable to an attack as to its constitutionality. See 16A C.J.S. Constitutional Law § 604c, p. 726."

Our appellate courts have repeatedly held that the burden of establishing the statutory elements by evidence rests squarely on the city which seeks to annex the unincorporated land, City of Bourbon v. Miller, Mo., 420 S.W.2d 296; City of Olivette v. Graeler, Mo., 369 S.W.2d 85; City of Tracy v. McCrea, Mo.App., 374 S.W.2d 553.

■ When is a proposed annexation "reasonable" as to both? No criteria as to the tests to be applied are stated in § 71.015. In the absence of statutory standards or guidelines the courts perforce have enumerated their own. Six factors for consideration are mentioned in Johnson v. Parkville, Mo., Mo.App., 269 S.W.2d 775. Seven more are suggested in City of Tracy v. McCrea, Mo.App., 374 S.W.2d 553, but the thirteen mentioned in those cases were not meant to be all inclusive, and others have been, and should be, considered. It has been said, for example, that a city may, to a *reasonable* extent, look to its future needs in planning and making an annexation, City of St. Joseph. v. Hankinson, Mo., 312 S.W.2d 4, but as pointed out in that case, and in State ex inf. Taylor ex rel. Kansas City v. North Kansas City, 360 Mo. 374, 228 S.W.2d 762, the rate of growth of the municipality as shown in the past is a highly important element to be considered in planning for the future. For as was succinctly put in City of Bourbon v. Miller, Mo., en banc, 420 S.W.2d 296, 303, "* * * what is reasonable for the future should be judged chiefly from the known and existing facts," and "* * * dreams or hopes * * *" inspired by a false sense of civic pride "* * * are not a sound and sufficient substitute for evidence in a legal action," City of Houston v. Duff, Mo.App., 338 S.W.2d 373, 382. In short, as the adjudicated cases indicate, there can be no exact, precise and inflexible standard by which the issues of reasonableness and necessity can be measured, and "* * * each case must depend on its individual facts and circumstances." City of Olivette v. Graeler, Mo., 338 S.W.2d 827, 837.

With these guidelines in mind we turn to a review of the evidence. The City of Mexico, a city of the third class, is the county seat of Audrain County. Its present city limits constitute virtually a square in shape, and encompasses an area of 4525 acres. As ultimately presented to the trial court by the City's amended petition, the city seeks to extend its boundaries on all four of its sides so as to annex a total of 4719 acres, but the proposed extensions are by no means uniform. In fact, the extent of the proposed area on each side is so irregular as to defy any description which could be comprehended, and relying on the Chinese proverb that one picture is better than a thousand words, we

include the following plat, on which the solid lines represent the present city limits and the dotted lines depict the areas proposed to be annexed:

SCALE 1/4" = 1000'

[A6061]

The subject of annexation is one which has been under consideration by the City for some time, although the extent of the area to be annexed, and the timing of the proposed successive annexations has varied. In 1964, at the request of the City, the firm of Harland Bartholomew & Associates submitted a report estimating that the then population of the city was 13,200, and projected a 1990 population of 22,000 to 25,000 persons. Based upon such projected increases in population that firm

recommended a two stage annexation program. The first stage recommended was to annex approximately 2,000 acres to the east of the present city limits; and the second envisioned an addition of approximately one-half mile on the south and west sides of the present boundaries. Thereafter the city council appointed a citizens annexation study committee which made its final report in 1967. In substance, the committee recommended the annexation of one-half mile on all four of the sides of the city.

In 1968 the city council employed the firm of Black & Veatch to make a study. In its report, submitted in October, 1968, Black & Veatch estimated that the 1970 population would be 13,850, and projected a population of 16,600 in 1990. In effect, that firm recommended that even more land on the north, south and east sides of the City be annexed than that shown on the foregoing plat, which would result in more regular boundaries. The total number of acres proposed to be annexed is not stated, but judging from the plat included in the report we estimate that it encompassed an area approximately 20–25 percent more than that presently proposed, or a total of about 6,000 acres. The city council's resolution followed the 1968 recommendation of Black & Veatch, and the original petition in this action, filed on July 15, 1969, was based upon that report. After answers had been filed the city employed Black & Veatch to update its 1968 study. In its 1970 report that firm recognized that instead of an increase in population there had been a decline in the decade from 1960–1970 and estimated the then population as 11,760. Black & Veatch likewise revised its projection of the 1970 population in the city to 15,261. Thereafter the city council enacted a new resolution on February 23, 1970, reducing the area sought to be annexed to 4719 acres, and an amended petition in accordance with that resolution was filed.

The premise upon which the City seeks to more than double its present size, as re-flected in the 1970 Black & Veatch report and the testimony of Stephen D. Kelly of that firm, is that the additional land will be needed in the future for residential, industrial, and commercial purposes. It should be noted that it was the theory of that firm that if 100 acres were needed for some purpose the City should annex three times as much, or 300 acres, in order that a prospective purchaser would have a wide choice as to a variety of sites. That theory of annexation might redound to the benefit of a prospective buyer, but we question whether it accords with the requirements of 71.015 as to reasonableness and necessity. The basic hypothesis upon which the 1970 Black & Veatch report built its case for the proposed annexation is that more new jobs would be created by the industrial concerns presently located in the city, and that for each new manufacturing job 1.5 to 2 new additional jobs would be created in sales and service activities. It is flatly stated in the report for example, that, " * * * A. P. Green Refractories and Florsheim Shoe Company project employment increases totaling more than 800 new jobs by 1990"; and that " * * * Two of the City's largest industries anticipate approximately 550 new male employees by 1990. * * *" The validity of those assertions, in our opinion, were utterly destroyed when Kelly, who had supervised the preparation of the report, conceded on cross-examination that he had nothing in his files from either Florsheim Shoe or A. P. Green to support the statement as to their projected employment increases, and that neither he nor any member of his staff had even talked to any responsible official of either company regarding the subject. Furthermore, the "two largest industries" in the area are A. P. Green Refractories and Kaiser Aluminum & Chemical Corporation. The personnel records of the latter concern, the successor to Mexico Refractories, showed that the number of its employees had declined from 775 in 1967 to 600 by the middle of 1970; and a responsible official of the company testified that it expected to

further reduce its work force by about 40 persons when its current modernization program was completed.

However satisfying to the municipal ego may be the rosy projections made in the 1970 Black & Veatch report, the hard, unvarnished and uncontroverted fact is that the City has lost, not gained, population in the decade from 1960 to 1970. The official census figures show that the City's population in 1950 was 11,623; in 1960 it reached a high of 12,889; and in 1970 it had declined to 11,807. Thus during that ten year period the City sustained a loss of over 1000 persons, or about 8 percent of its 1960 peak, to a figure approximating that of 1950. An exhibit introduced by the City shows a corresponding decline in the number of building permits issued for new residential construction in the municipality, from a high of 86 in 1955, to 21 in 1969, and only 8 in the first seven months of 1970. Nor can the City's loss of population be attributed to any marked movement of persons from the City to the unincorporated areas. Kelly estimated that the number of persons who resided in 1963 in all of the 4917 acres sought to be annexed was about 400; and that by 1970 the number had increased to approximately 839. Even if it is assumed, though it was not shown, that all of the approximately 439 new residents in the unincorporated areas had moved there from the City during that period it is obvious that that figure does not correspond to the City's loss of population, nor does it indicate any significant exodus from the City to the areas proposed to be annexed.

In the 1970 report of Black & Veatch it was stated, and Kelly testified, that there were 801 acres within the present city limits which were vacant and suitable for some type of development. Thus of the 4525 acres within the present boundaries it is conceded that about 18 percent are available for development. And the figure of 801 acres did not include 292 acres of vacant land in the flood plains of the Salt River and Davis Fork, nor did it include approximately 240 acres in a tract referred to in the evidence as the "Green Estate." That tract, admittedly suitable for residential development, was excluded on the supposition, never adequately shown, that the owners would not sell at any price. Of the 801 acres suitable for development Black & Veatch classified 560 acres for residential purposes, 66 acres for industrial purposes, 17 for commercial development, and recommended the reservation of the remaining 158 acres for public and recreational purposes. The report conceded, and Kelly confirmed, that the 560 acres of vacant land then available for residential purposes was sufficient to contain the anticipated 1990 population.

There is nothing in the evidence which would indicate that there is any pressing need for more land for industrial purposes than that presently available. So far as the record before us shows only two industrial concerns of any consequence have located in Mexico in the recent past, and there was no evidence that any have been lost because of a dearth of available and suitable sites. As to commercial developments, the record shows that two new shopping centers have been constructed a short time before the trial, one within the City limits and the other near its southern boundary, and there is no evidence in the record that the remaining vacant acreage will be inadequate for commercial purposes in the foreseeable future.

From the standpoint of the unincorporated areas the unreasonableness of the proposed annexation is even more pronounced. Starting in the north, a substantial part adjacent to the northern boundary, extending in an east-west direction, is a part of the flood plains of Salt River and Davis Fork, and hence not suitable for development. The part extending directly northward, referred to as the northwest neck, contains 365 acres, of which 289 acres are used for agricultural purposes, as are a portion of the remainder of 76 acres. The only commercial business in the northwest neck is the Snell Auction Company. The exten-

sion in a northeastwardly direction, designated as the northeast neck of the northern area contains 496 acres, of which Kaiser Aluminum owns 466 acres, McGee Packing Company 8, D. A. Surl 10, and H. Pehle 12. Kaiser and McGee use their respective properties for their own industrial purposes. Surl and Pehle farm their lands, and in addition to their houses there is a home for the caretaker on the Kaiser tract. In all, only 7 people live on the 496 acres in the northeast neck. Appellants contend, with more than a measure of plausibility, that the primary reason for the annexation of the northwest neck is to obtain for the municipal coffers the taxes which would inure to the City by the inclusion of that area.

The area to the east of the present city limits extends a distance eastwardly of approximately three miles, and contains 1698 acres. Of that number about 72 percent are presently used for agricultural purposes. The major portion of the eastern area is bisected by U. S. Highway 54 East. Some development of small commercial establishments and homes have occurred along the highway. A trailer court, as well as three small subdivisions, scattered residences, and a country club are located in the east area, but as stated the major portion is used for farming and pasturing. While the evidence showed that 132 people resided in the 52 mobile homes in the trailer court, no figure was given for all of the persons living in the entire east area.

As appears from the plat, the southern area, similar to the eastern area, is irregular in shape. The central elongation, divided by U. S. Highway 54 South, extends a distance of approximately 2⅗ miles from the present City limits. The entire southern area contains 1391 acres and 63 dwelling units, of which 37 are mobile homes located in a trailer court situated approximately 2 miles south of the present city limits. One subdivision of 60 acres, platted into 45 lots, of which 13 had been sold, is located in the south part of the eastern portion of the south area, not adjacent to

the present City limits, but the new shopping center does adjoin the boundary. An implement company is located on the highway about three-fourths of a mile from the City limits, and at the southern end of the elongation are a motel, a filling station, and a restaurant. Of the 1391 acres contained in the southern area 1276 are presently used for agricultural purposes. No figure was given for the persons residing in the area.

In general, the area proposed to be annexed on the west side of the City would extend its boundary in that direction about one-quarter of a mile for most of its length, and about five-eighths at its northern end. It contains 428 acres, 12 houses, a salvage company, and a packing company. The total of 428 acres includes 119 in the flood plains of the Salt River, 24 acres of railroad right-of-way, and about 260 acres devoted to agricultural purposes.

Thus an area by area review of the proposed annexation demonstrates that the vast majority of the land which the City seeks to acquire is agricultural land. As the testimony of Kelly, the City's witness revealed, all of the areas are sparsely populated, and the total of 4917 acres contain only 268 dwellings housing about 839 persons. The few subdivisions mentioned in the evidence are not contiguous to its present limits, and the maps introduced by the City do not show that any streets or thoroughfares extend into the unincorporated area, other than the State or U. S. Highways. Thus there has been no "spilling over" of the population from the City to the unincorporated area so frequently given as the basis for a proposed annexation. And the foregoing plat clearly indicates that if the proposed annexation was approved it would result in an odd shaped municipality with highly irregular city limits.

■ Whatever merit there may be to a reasonable amount of expansion of the City to the east, and perhaps to the south, we have no hesitancy in saying that the in-

ordinate annexation proposed in the present proceeding, considered as a whole, is both "unreasonable and arbitrary," City of Bourbon v. Miller, 420 S.W.2d 296, 303. Having reached that conclusion we do not reach nor need not discuss the second issue raised, that of the sufficiency of the evidence to support the finding that the City would be able to furnish its normal municipal services to the proposed annexed area within a reasonable time.

Accordingly, the judgment of the circuit court is reversed and the cause is remanded with directions to enter a judgment dismissing plaintiff's petition with prejudice as of October 29, 1970, the date of the original judgment.

PER CURIAM:

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court. Accordingly, judgment reversed and cause remanded with directions.

DOWD, P. J., and SIMEONE and SMITH, JJ., concur.