CITY OF O'FALLON, Missouri, a Munic-
ipal Corporation, Plaintiff-Appellant,

v.

Leonard BETHMAN et al.,
Defendants-Respondents.

No. 38819.

Missouri Court of Appeals,
St. Louis District,
Division Four.

June 13, 1978.

Motion for Rehearing and/or Transfer
Denied July 14, 1978.

Application to Transfer Denied
Sept. 12, 1978.

Robert M. Wohler, St. Charles, Louis S. Czech, Clayton, for plaintiff-appellant.

Robert V. Niedner, Niedner, Niedner, Ahleim & Bodeux, St. Charles, Fordyce & Mayne, Leo V. Garvin, Jr., Clayton, for defendants-respondents.

DOWD, Presiding Judge.

Annexation case. O'Fallon, a city with a population in 1976 of 8,200 and 2,739 acres of land, seeks to annex a contiguous unincorporated area of 1,673 acres with a small population.[1] There was no dispute that O'Fallon had a strong fiscal base with a large budgetary surplus for calendar year 1976. The city appeals a judgment of the circuit court of St. Charles County holding that it failed to demonstrate the reasonableness of its annexation plan and dismissing its petition.

O'Fallon is a city of the fourth class centrally located in St. Charles County. It has a uniform southern boundary formed by interstate highway 70 which is joined to the north by what may be termed two irregular "northwestern" and "northeastern" boundaries. The proposed area of annexation is contiguous to the northeastern boundary. The area's predominant boundary is formed by state highway 79 which intersects with O'Fallon's city limits to the southeast and with state highway M to the northwest. Highway M runs north and south through the center of O'Fallon and intersects with highway 79 about three-quarters of a mile north of the city limits. Twenty-five acres in the area is city-owned property lying directly north of the intersection of highways M and 79.

Following our review of the lengthy trial record, accumulated over four days of testimony before the court, we feel the evidence made the issue of the annexation plan's reasonableness a "fairly debatable" one. We thus reverse the trial court's judgment and hold that O'Fallon did sustain its burden of proof on the reasonableness issue.

██ Section 79.020, RSMo empowers the mayor and board of aldermen of a fourth class city, with the consent of the voters of that city, to extend the city limits over adjacent territory "in such manner as in their judgment and discretion may redound to the benefit of the city . . . ." Section 71.015, RSMo (Sawyers Act) is procedural in nature and applies to all cities. It provides that whenever the governing body of a city chooses to exercise its power to annex adjacent unincorporated territory and has adopted a resolution to that effect,[2] the city shall, before seeking the consent of the voters in a municipal election, obtain a declaratory judgment authorizing it to proceed with the annexation. Under § 71.015 the city's petition must state facts showing (1) the area to be annexed, (2) that such annexation is "reasonable and necessary to the proper development of said city"[3] and (3) the ability of the city to furnish its normal municipal services to the unincorporated area within a reasonable time after the effective date of annexation. Unlike pre-Sawyers Act cases the municipality

1. The parties disagreed as to the area's population. A witness for O'Fallon estimated it to be 270 while several of the area residents testified that an informal survey revealed an actual count of 113.

2. The term "resolution" has been interpreted broadly to include any ministerial direction to city legal officers to institute a declaratory judgment suit or any other manifestation of intent to annex. The city need not adopt an annexation ordinance. *City of Hannibal v. Winchester*, 391 S.W.2d 279, 283 (Mo. banc 1965); *City of Salisbury v. Nagel*, 420 S.W.2d 37, 43 (Mo.App.1967). Prior to instituting its declaratory judgment action under § 71.015 the board of aldermen of O'Fallon adopted a resolution, signed by the mayor, stating (1) its belief that the proposed annexation was reasonable and necessary to the proper development of the city, (2) its ability to furnish normal municipal services to the described area within a reasonable time, and (3) directing that counsel for the city file a petition praying for a declaratory judgment authorizing the annexation.

3. This requirement is interpreted by the supreme court to embody the "two separate but closely related concepts" that (a) the annexation is reasonable and (b) the annexation is necessary to the proper development of the city. All parties are thus entitled to the test of reasonableness. *City of Olivette v. Graeler*, 338 S.W.2d 827, 836–837 (Mo.1960). The *Graeler* decision is discussed in Note, Annexation by Municipality, etc., 1961 Wash. U.L.Q. 159, 163–168.

seeking to annex now carries the burden of establishing reasonableness as well as the other required elements of § 71.015. *Young v. Mayor, Council & Citizens,* 531 S.W.2d 732, 737 (Mo. banc 1976); *City of Mexico v. Hodges,* 482 S.W.2d 545, 547 (Mo.App.1972).

■ Several threshold issues are presented before we reach the issue of the reasonableness of the annexation. The Sawyers Act directs that the city maintain the action as a class action against the inhabitants of the unincorporated area under the provisions of § 507.070, RSMo. That section requires that the class be such that its members will fairly insure adequate representation. Rule 52.08 requires that the claims or defenses of the representative parties be typical of those of the class and that the representatives will fairly and adequately protect the interests of the class. These requirements are mandatory and not merely technical or directory. *City of Aurora v. Coleman,* 490 S.W.2d 668, 670 (Mo. App.1973); *City of Salisbury v. Nagel,* 420 S.W.2d 37, 47 (Mo.App.1967).

■ Respondent contends that the city's designation of the representative parties against whom suit was brought violated the statute, emphasizing that only three of thirty farm tract owners were named as members of the class—a nonresident owner of a 5-acre tract (Peuser), an owner of a 5-acre tract from whom O'Fallon had previously purchased property (Bethman) and a retired farmer living on a 90-acre tract who represented a small fraction of the total agricultural acreage in the area (Mispagel). We rule this point against respondents.

■ The adequacy of a representative class must be determined under the factual circumstances of each case. *City of St. Ann v. Buschard,* 299 S.W.2d 546, 554 (Mo.App. 1957). Many factors may be considered in making such a determination. The primary consideration, however, is that all diversified class interests and points of view be represented and that those parties that are named represent a truly adverse interest so that issues are actually litigated without collusion. The rights of absent class members must be protected. *City of Aurora v. Coleman,* 490 S.W.2d 668, 670 (Mo.App. 1973); *City of St. Charles v. Schroeder,* 474 S.W.2d 55, 60 (Mo.App.1971); *Milton Const. & Supply Co. v. Metropolitan St. Louis Sewer District,* 308 S.W.2d 769, 772 (Mo.App. 1958). In *City of St. Charles* the rejection of a class was due in part to the absence of an agricultural representative.

Under the facts of this case and applicable law the city's selection of the named defendants to represent the inhabitants of the area was sufficient to satisfy the statutory requirements. The city had earlier purchased land from defendant Bethman for a sewage lift station and he had indicated he would oppose any attempt at annexation. Defendant Mispagel owned a 90-acre tract immediately west of Monsanto's property on which crops were raised by a tenant and beef cattle by Mr. Mispagel himself. He had indicated hostility at a proposal by O'Fallon to obtain a second sewer easement over his property. Mrs. Mispagel owned a one-fourth interest in an 82-acre tract located on the opposite corner of the proposed area which was put to agricultural use. The two industrial tract owners (Monsanto Chemical Company and Sucat, Inc.), the owner of the school site (Fort Zumwalt School District), and the owner of the church site (Hope Bible Church) were designated as defendants.

■ Although representatives of the school and church testified in favor of annexation they were the sole representatives of their respective interests. While Monsanto announced at the beginning of the trial that it did not oppose annexation the other industrial tract owner was named and did present evidence in opposition to annexation. The fact that some named defendants do not oppose or may in fact support annexation does not require a holding that other named defendants cannot adequately represent the interests of all the inhabitants. *City of Des Peres v. Stapleton,* 524 S.W.2d 203, 206 (Mo.App.1975). The fact that defendants' counsel demonstrated competence and a willingness to challenge every element of the city's case and did in

fact prevail in the circuit court precludes the possibility of collusion having taken place in this lawsuit.

 Respondents further contend the trial court's decision may be supported by the failure of the city's petition to describe the area sought to be annexed. Section 71.015 provides that the petition shall state facts showing the area to be annexed. It does not indicate how those facts should be stated. The purpose of this provision is that property owners and others with an interest in the action receive notice and be able to determine the land proposed to be annexed and that the court know the area on which it must decide the issues of reasonableness and ability to provide municipal services. *Young v. Mayor, Council & Citizens*, 531 S.W.2d 732, 737 (Mo. banc 1976); *City of Cape Girardeau v. Armstrong*, 417 S.W.2d 661, 674 (Mo.App.1967); *Waller v. City of Macon*, 277 S.W.2d 886, 890 (Mo. App.1955).

The city's petition does describe the area sought to be annexed with the use of degrees, arc lengths, "centerline stations" and references to deeds located in the county recorder's office. It is conceded that it would require professional training and much effort to fully understand and verify all parts of the description which covers eleven pages of the trial record. We note, however, that the technical description is supplemented throughout by reference to many of the owners of the property being described and to standard points of reference. O'Fallon provided a detailed map of the area at trial divided into individually-owned parcels of land that was prepared by an engineering firm based upon the legal description contained in the city's petition. The exhibit demonstrated that the proposed area was essentially enclosed within such well recognized boundaries as two state highways and the present O'Fallon city limits. Another exhibit contained numbered references to the owners of the properties depicted on the map. The majority of property owners not named as defendants demonstrated they did have knowledge of the affected area by intervening in the cause.[4] This point must also be ruled against respondents.

Respondents also allege that appellant's brief failed to comply with Rule 84.04(c) and (d) because it did not fairly state the facts of the case and because the points relied on constituted mere abstract statements of law. A motion to dismiss appellant's appeal was filed. On September 12, 1977, this court ordered appellant's brief stricken, denied the motion to dismiss, and ordered appellant to resubmit in compliance with Rule 84.04. On the briefs now submitted this appeal will be decided and the motion to dismiss denied.

The determining issue here and the essential consideration in most annexation cases is thus whether the city has sufficiently established the reasonableness of its proposed plan.

Appellant's primary contention on appeal is that the issue of reasonableness was "debatable" and thus should have been resolved in favor of the resolution adopted by the board of aldermen. Appellant emphasized that annexation will help make the boundaries of the city regular, that the city does provide water, police and other municipal services to the area, and that the city needs the area for growth. Respondents' arguments emphasize that the governmental services O'Fallon would provide residents of the area are either not needed or adequately provided by St. Charles County, that the area to be annexed is too large relative to O'Fallon's existing size, that the area is primarily used for agricultural purposes and its population density is low, that there is no present demand in O'Fallon for additional industrial property and that vacant land for residential, commercial and industrial development existed in O'Fallon at the time the suit was instituted, that O'Fallon's population, while increasing, has been doing so at a declining rate, and that the natural movement in population outside of O'Fallon has been to the south, away from the proposed area.

4. Forty-two parties, including spouses, were permitted to intervene in this litigation and they joined in defendant Bethman's and Mispagel's answer to O'Fallon's petition.

■ Before reaching the merits of these contentions it is first necessary to determine our scope of review and the standards to be applied. The authority granted to cities to extend their corporate limits constitutes a broad grant of discretionary power. While the judiciary plays an important role in the annexation process, as contemplated by § 71.015, case law makes clear that the role is a limited one. Annexation is a legislative function. *Young v. Mayor, Council & Citizens*, 531 S.W.2d 732, 737 (Mo. banc 1976); *City of Lexington v. Shepard*, 344 S.W.2d 308, 311 (Mo.App.1961). It is not for the court to determine in the first instance whether the weight of the evidence supports a finding of reasonableness. The initial determination was made in favor of reasonableness when the governing body of the city adopted its annexation resolution. The scope of judicial review is to determine whether the reasonableness of the municipal resolution is fairly debatable; if so, it is conclusive on the courts; if not, the city has abused its legislative discretion and the declaratory judgment will not issue. *City of Jefferson v. Smith*, 543 S.W.2d 547, 549 (Mo.App.1976); *City of Cape Girardeau v. Armstrong*, 417 S.W.2d 661, 675 (Mo.App. 1967); *Johnson v. Parkville*, 269 S.W.2d 775, 777 (Mo.App.1954); *State ex rel. Eagleton v. Champ*, 393 S.W.2d 516, 532 (Mo. banc 1965); *City of St. Peters v. Kuester*, 402 S.W.2d 70, 75 (Mo.App.1966). Under the "fairly debatable" standard the extent of judicial inquiry is whether substantial evidence has been presented by the city to support the determination of its governing body such that reasonable men could differ as to the necessity of the extension. *City of Olivette v. Graeler*, 369 S.W.2d 85, 96 (Mo. 1963); *State ex inf. Mallett ex rel. Womack v. City of Joplin*, 332 Mo. 1193, 1205, 62 S.W.2d 393, 398 (1933); *City of Des Peres v. Stapleton*, 524 S.W.2d 203, 207 (Mo.App. 1975).

Courts have assessed the reasonableness of numerous proposed annexations and have articulated many factors relevant to a determination of reasonableness.[5] It has been uniformly recognized, however, that past cases can only serve as general guides and that each proposed annexation must be viewed on its own unique facts, and that no single factor is determinative. *City of St. Ann v. Buschard*, 356 S.W.2d 567, 570 (Mo. App.1962); *City of St. Peters v. Kuester*, 402 S.W.2d 70, 74 (Mo.App.1966). It was held in *City of Houston v. Duff*, 338 S.W.2d 373, 382 (Mo.App.1960) that "[i]n no other class of suits is it settled more firmly or with better reason that each case must stand on its own facts."

■ A case of reasonableness is made when it appears that the land to be annexed is so situated as to be adaptable to urban purposes and necessary or convenient to a reasonable exercise of the city government. *City of Perryville v. Brewer*, 557 S.W.2d 457, 462 (Mo.App.1977); *City of St. Joseph v. Hankinson*, 312 S.W.2d 4, 18 (Mo. 1958); *City of Jefferson v. Smith*, 543 S.W.2d 547, 550 (Mo.App.1976); *City of Salisbury v. Nagel*, 420 S.W.2d 37, 46 (Mo.App. 1967); *Dressel v. City of Crestwood*, 257 S.W.2d 236, 249 (Mo.App.1953). The city and the proposed area are both entitled to the test of reasonableness and the need of the area for the city's services should be considered. *City of Olivette v. Graeler*, 338 S.W.2d 827, 838 (Mo.1960).

■ We feel that the evidence presented by the city of O'Fallon created a fairly debatable issue (1) as to its need within the reasonably foreseeable future for additional land to accommodate its natural expansion and growth, (2) that the proposed area is so situated as to be adaptable to urban purposes and that development will occur there within the reasonably foreseeable future, and (3) that annexation would be necessary and convenient to the exercise of municipal

---

5. Several cases list many of the relevant factors. *City of Perryville v. Brewer*, 557 S.W.2d 457, 462 (Mo.App.1977); *Johnson v. Parkville*, 269 S.W.2d 775, 777–778 (Mo.App.1954). The sources of these factors are identified in Note,

Annexation by Municipality, etc., 1961 Wash. U.L.Q. 159, 160–162, and in Comment, Change of Boundaries by Missouri Municipal Corporations, 19 U.K.C.L.Rev. 186, 187–190 (1950–51).

area governmental functions and be beneficial from the standpoint of the proposed area as well as O'Fallon. Having sustained its burden of proof with respect to these general issues, O'Fallon must prevail with respect to the ultimate issue of the reasonableness of its annexation plan.

 O'Fallon's "comprehensive plan," a study prepared for the city by George Butler and Associates, its engineering and consulting firm, indicated that in 1974 about 800 of O'Fallon's 2700 acres were vacant even after allowances were made for severe topographic features and future right of ways.[6] The amount of usable vacant property under each general zoning classification was 92.8 for single family and 114.9 for multifamily residential development, 72 for commercial and 528 for industrial development, with no vacant property available for public use. Richard Metts, a landscaper and real estate agent, testified that he had recently been involved in the development of as many as 50 residential acres in O'Fallon and that while there may have been 92 usable acres for subdivision development in 1974 he knew of only 50 acres not being developed or in the planning process. Mayor Peters of O'Fallon agreed that only 50 acres were suitable for subdivision development and Michael Whitaker, his assistant, indicated the city was in discussion with developers as to the remaining acres. Following a high level of building permits for

single family residences issued for the years 1965–67 (86, 54 and 70), an average of only 18 permits were issued in 1972–74. While 7 multifamily permits were issued in 1971, none were issued in 1972–74.[7] Commercial and industrial permits for the five-year period 1970–74 averaged 11.6 compared to 5.4 for the period 1965–69. A developer who had constructed two shopping centers in O'Fallon testified for the city that, in his opinion, only 7 acres remained for good commercial development. O'Fallon's population more than doubled from 1960–1974 as indicated by two census reports and water meter estimates for intervening years. While the population increased each year, the rate of increase declined for the years 1968 to 1974.[8]

 The concepts of "reasonableness" and "necessity" as used in § 71.015 have been recognized as closely related, though separate. *City of Olivette v. Graeler*, 338 S.W.2d 827, 836–837 (Mo.1960). In *City of St. Joseph v. Hankinson*, 312 S.W.2d 4, 9 (Mo.1958), the supreme court held that "[i]n annexation cases, generally, the necessity [of annexation] actually seems to become a part of the 'reasonableness.'" *Accord, City of Aurora v. Empire District Electric Co.*, 354 S.W.2d 45, 48 (Mo.App.1962), adding that the necessity of annexation "applies not only to the present but also to such future needs as are reasonably foreseeable . . . ."[9] While the present need of a

---

**6.** Without allowance for unusable land the study indicated that 1250 acres of the 2739 total were vacant, 636 in areas zoned for industrial use, 90 for commercial use, 178 for multifamily residential use, and 348 in areas zoned for single family residential use.

**7.** As an offer of proof an O'Fallon alderman testified that in 1976, up to the date of the trial, 4 multifamily and 20 single family permits for residential development had been issued, as well as 6 permits for commercial building and 23 permits for additions to homes. This testimony was objected to on the ground that reasonableness is to be determined as of the date the city's declaratory judgment suit is filed. We believe that evidence existing at the time an annexation suit is tried which reflects on the reasonableness of the city's *projections* at the time it filed its petition should be admissible.

*See City of Cape Girardeau v. Armstrong*, 417 S.W.2d 661, 672 (Mo.App.1967).

**8.** The estimated population increments for the years 1961 to 1974, shown in parentheses, were as follows: 1961 (375); 1962 (386); 1963 (325); 1964 (415); 1965 (364); 1966 (327); 1967 (308); 1968 (365); 1969 (226); 1970 (157); 1971 (193); 1972 (100); 1973 (135); and 1974 (162).

**9.** The element of *reasonable* growth projection was emphasized in *City of Houston v. Duff*, 338 S.W.2d 373, 382 (Mo.App.1960), in which the court found the city had much land remaining in which to expand: "commendable as is civic pride (not to be confused with uncontrollable compulsion for, stubborn attachment to, or abject adulation of a city, which are hallmarks of frailty), dreams or hopes thereby inspired are not a sound and sufficient substitute for evidence in a legal action."

city for additional land is a relevant consideration a court should look to the future and be cautious in denying an annexation on the sole basis that the municipality still has some undeveloped land. There is no requirement that a city utilize all vacant land before it is able to extend its city limits. *Mauzy v. City of Pagedale*, 260 S.W.2d 860, 865 (Mo.App.1953); *City of Fulton v. Dawson*, 325 S.W.2d 505, 517 (Mo. App.1959); *Dressel v. City of Crestwood*, 257 S.W.2d 236, 249 (Mo.App.1953); *City of St. Joseph*, 312 S.W.2d at 18.

We believe that O'Fallon certainly raised a fairly debatable issue as to its need for additional land as an alternative to having its growth as a city stagnate. The city argued convincingly that a growing city needs to offer prospective developers a choice of desirable land on which to build as opposed to only certain tracts that the developer may not perceive as desirable.[10] Vacant land in a city can vary greatly in its desirability for building lots. A decreasing amount of available land could well be the reason O'Fallon's population had been increasing only at a declining rate.

Respondents further argue that if O'Fallon does need more land for growth the more logical area for it to expend would be to the south, not the north and northeast, where six new subdivisions had developed within two miles of O'Fallon's southern border. It is true that a city should not attempt to dictate the direction of its growth by an annexation inconsistent with reasonable growth projection, *City of Aurora v. Empire District Electric Co.*, 354 S.W.2d 45, 54 (Mo.App.1962), and an attempt to do so can reflect on the element of reasonableness. *See, generally, City of St. Joseph*, 312 S.W.2d at 20. The fact an area in one direction of a city is currently developing in terms of population and a proposed area is not does not, however, preclude an inquiry into the reasonableness of the proposed annexation. A finding that a city is

attempting to force itself into an unnatural growth pattern is more a conclusion to be reached after other factors have been considered rather than a factor in itself on the ultimate issue of reasonableness. On the related issue of whether it was unreasonable to include certain area within an annexation the court in *City of Fulton* stated that courts should not say that a city council "might have more reasonably exercised its discretion if it had proposed to annex less, or more, land; or had excluded, or included, certain areas." 325 S.W.2d at 518.

Respondents emphasized in their direct and cross-examination that any population growth in the annexation area in the past decade had been nominal, that no subdivisions had developed, that many planned utilities and roads would not be built until residential development warranted it, and that most of the land in the area was at least owned agriculturally and put to such agricultural use as growing crops, timber or raising cattle. Two of the residents testified as to a private survey they conducted that revealed the existence of only 30 homes and 113 persons in the area. Some area residents who testified in opposition to annexation feared that city ordinances would prevent or restrict their present use of their land. There was testimony that firearms were used in varmint control.

There was also testimony that sufficient water for their needs was provided by a deep well on their own property, that sewage disposal was accomplished with the use of septic tanks, that they provided for private garbage collection and that they called the county sheriff's office when they needed assistance and were satisfied with their police protection. All stated they had no plans to sell their land for development.

The area certainly is not used exclusively for rural purposes. The city of O'Fallon owns over 30 acres, most of it representing property purchased in 1970 lying north of

---

**10.** Respondents argue that O'Fallon's projected growth could be accommodated for the foreseeable future within present available acreage. They note that with a population increase of 150 per year, an average household of 4.1 persons and an average of one-third acre needed per house and with 92 single family acres vacant O'Fallon would need only 10–12 acres per year to accommodate its growth.

the city on which is located a large sewage treatment plant, the firing range for the O'Fallon police department and a lighted softball diamond and park. The city had also purchased part of defendant Bethman's property for the construction of a sewage lift station. Defendant Monsanto Chemical Company owned a 67-acre improved industrial tract in the eastern sector of the area. Defendant Sucat, Inc. owned an unimproved tract also located in the eastern sector[11] which at the time of trial was being advertised for sale as an "industrial site." The improvements on Sucat's property were located east of highway 79, outside of the area. The county had zoned Sucat's tract for industrial use. Defendant Fort Zumwalt School District, the district serving O'Fallon, the proposed area, and several surrounding communities, owned a 76-acre site located in the east-central section of the area on which was located Cool Springs School, a junior high school, that in the fall of 1976 was to become the district's high school for 1,600 students. The parking facility for sixty school district busses was located on the site and the busses used the area's roads extensively. Defendant Hope Bible Church owned a 7½-acre tract near O'Fallon's city limits in the western sector of the area. Respondents did not specify how many acres of the land was actually tillable and used for the production of crops. The landscaper who did survey work in the area for O'Fallon had the opportunity to observe much of the northern boundary of the area along highway 79 and testified that it was primarily used for pasture or agricultural purposes, and was "fairly well wooded and rough" with "quite a bit of pasture and wooded land."

Edward Runge, whose children went to two different schools in O'Fallon, owned 10 acres bordering on highway 79 of which only one acre was used for farming. The rest of the property was either wooded or used for buildings for the Runge Land Company's 400-acre farming operation north of highway 79 and outside of the proposed area.[12] Runge's brother, who worked elsewhere, lived on a 3-acre tract to the south of Runge near the school which was not farmed. His sister, whose husband worked elsewhere, lived on a nearby 3½-acre tract of which Runge farmed the "tillable" 2½ acres. Paul Didion testified to his purchase of a 55-acre tract in the west-central part of the area in 1972 and that he had recently built a home on 9 of the acres and raised beef cattle on the remaining acres. He worked with the Didion Foundry in the city of St. Peters.

There was evidence as to some residential development in the western sector closer to the city limits of O'Fallon. The surveyor who worked for O'Fallon testified that there were "[q]uite a few homes near old 79 and highway M," although no subdivisions. An intervenor testified that she lived in the area near O'Fallon, had children who went to O'Fallon schools and would go to the high school in the area, and that her husband had been a businessman in O'Fallon since 1951 and had interests in two additional O'Fallon businesses. Another intervenor was a "part-time" farmer who lived on a 2-acre home in the western sector, worked as a cement mason, and farmed about 30 acres in the area for others. His children went to St. Barnabas School in northern O'Fallon. Another intervenor testified that he lived on 1.8 acres in the western sector but did farm others' property (about 250 acres) in that sector, largely dairy livestock and grain farming. Several tracts in the western sector were hooked into O'Fallon's sewer or water line.

It is significant that much of the agricultural land in the area was worked by part-time farmers, often for cattle raising, or by

---

11. In 1970 O'Fallon annexed an 80-acre rectangular tract of land now zoned industrial which extends northward into the proposed area and which separates the Monsanto tract, to the west, from the Sucat tract, to the east.

12. The land north of highway 79, outside of the area, was comprised of large agricultural tracts including the Runge Land Company tract, much of August Busch's Belleau Farm, and a large tract owned by Joseph Boland, another intervenor, part of whose land extended into the area.

tenants or others hired to work the land while many of the owners had jobs or lived elsewhere. It is probably fair to infer that much of the agricultural production in the area was for private consumption and was not marketed commercially on a large scale. The co-owners of the largest tract in the area (460 acres) both lived in O'Fallon. One served as the principal of a school in the Fort Zumwalt School District and the other was an O'Fallon merchant. A tenant lived on and worked the farm, tending grain and forestry land (they have harvested and marketed some of their trees) and 50–75 head of cattle. Defendant Mispagel's tract, next to Monsanto's property, was used for raising 25 head of cattle. A tenant farmed the remaining tillable land.

▮▮▮▮▮ The annexation of land to a city to accommodate anticipated growth requires a great deal of planning and the city is permitted to look ahead and provide for reasonable development several years in advance. *City of Fulton v. Dawson*, 325 S.W.2d 505, 517 (Mo.App.1959); *Dressel v. City of Crestwood*, 257 S.W.2d 236, 249 (Mo. App.1953). The caveat still applies, however, that projected growth and development must have a basis in objective fact and cannot be based on the visions or speculation of city fathers or planners that do not have a firm evidentiary base. *City of Mexico v. Hodges*, 482 S.W.2d 545, 547 (Mo. App.1972); *City of Aurora v. Empire District Electric Co.*, 354 S.W.2d 45, 48 (Mo. App.1962). In the absence of such an evidentiary base the courts must exercise their limited role in annexation matters and not permit the annexation to proceed.

▮▮▮▮▮ It is our view that projected growth and development in the proposed area does have a sufficient evidentiary base to support the determination of O'Fallon's board of aldermen. The fact that an area is sparsely populated without significant residential development and that much of it is utilized for purposes of an agricultural or rural nature is an important consideration but is not determinative on the issue of reasonableness. It does not preclude an examination of other evidence indicating the land is in fact adaptable to urban usage. *City of St. Joseph v. Hankinson*, 312 S.W.2d 4, 19 (Mo.1958); *City of Fulton v. Dawson*, 325 S.W.2d 505, 517–518 (Mo.App.1959); *City of Woodson Terrace v. Herklotz*, 349 S.W.2d 446, 452 (Mo.App.1961). In *City of Perryville v. Brewer*, 557 S.W.2d 457, 468 (Mo.App.1977), this court approved an annexation in which 20% of the land was used for agricultural purposes. In *City of Fulton* it was indicated that even if approximately one-half of the land was used for farming or grazing purposes that fact "does not of itself mean that the city's exercise of its legislative decision to annex it is so unreasonable as to be an abuse of its legislative powers. Rather it is but a factor to be considered along with the other pertinent factors comprising the total picture . . . ." 325 S.W.2d at 517–518.

O'Fallon offered testimony from several sources as to projected population growth in the area. A real estate broker testified that growth around O'Fallon and in St. Charles County in general was augmented by its relationship to the St. Louis metropolitan area. Based upon a study conducted for St. Charles County by Harland Bartholomew and Associates the planning director for the county indicated that in his opinion there would be population growth in the proposed area. While indicating that in 1990 the great majority of the land in the county would still be put to non-residential use, largely agricultural, the study stated that "[a] pattern of concentrated population growth in the I–70 corridor," the primary interstate access route into St. Louis County, was projected. Such development would serve to augment the population of areas in proximity to such cities as St. Charles, St. Peters, O'Fallon, Lake St. Louis and, to some extent, Wentzville. With reference to the proposed annexation area the study projected that residential development would occur in the western half. George Butler, president of George Butler Associates, O'Fallon's consulting firm, projected that the population in the proposed area would grow from a reported 262 in 1974 to 606 by 1980 and to over 3,000 by the year 2000.

The generalized county zoning for the area in 1971 did provide for single family residential development in the western quarter, industry in the far eastern sector (including the Monsanto tract) with most of the central territory, including the present school site, zoned agricultural with a 5-acre lot size minimum. A 1973 zoning adjustment placed the entire area under the agricultural classification with the exception of the eastern industrial section.

In accordance with the county's projected population trend the county's planning director testified that projected land use for the area was "residential and industrial." A land use plan was developed in 1972 for the county in which the western half of the area was allocated for low density residences of five units per acre or less and the eastern half for "major industry" with the exception of a corridor planned for agricultural land, parks and open space. The county's plan, apparently not accounting for the existence of a school, included the present school site within the industrial and open space area. The county director indicated that "as far as the county is concerned, residential development is predicated upon the accessibility of the roads, sewers and water." Accessibility of the area to existing areas of urban growth including schools and an urban police force are additional factors. With particular reference to industry he noted the ready access to railroad facilities and interstate highway 70. Based upon these factors it was his opinion that the area was adaptable for the development of subdivisions. George Butler, noting the existence of utilities and stating that most of the area does lend itself topographically to development, presented O'Fallon's projected land use plan for the area. The western half would be zoned for single family development with the exception of 15 commercial acres and the land on which the sewage treatment plant and park are located. One-third of the eastern half would be allocated for public use (the school site) and for multifamily development near the school site that would serve as a buffer to a large industrial park area in the easternmost section.[13]

Alfred Knobbe, a real estate broker and developer in O'Fallon, testified that he was developing an area of approximately 190 acres into 3-acre residential tracts immediately northwest of O'Fallon and within about one mile of the western border of the proposed area—"Today I'm putting down the road." He stated he had built houses in the development and that it included shopping center facilities as well as the large single family lots.

■■■ The fact that a city is providing or has the capacity to provide such municipal services as sewer and water facilities to an area is a significant consideration on the issue of reasonableness. It also constitutes part of a required element to be proven under § 71.015. An area will tend to develop more rapidly when such municipal services are available. *City of Olivette v. Graeler*, 338 S.W.2d 827, 836 (Mo.1960); *City of St. Joseph v. Hankinson*, 312 S.W.2d 4, 20 (Mo.1958).

Within the two year period before trial O'Fallon acquired easements from area property owners (many of them intervenors in this case) and constructed a 16″ forced main outfall sewer line[14] extending from the sewage treatment plant (located at the northwest tip of the proposed area) along most of the northern boundary of the area (highway 79) before turning in a southwestwardly direction in close proximity to the high school site and Monsanto plant before terminating in the central section of O'Fallon. A second outfall line extended from the treatment plant in a southwardly direction serving the western sections of O'Fallon and the proposed area. Several years earlier O'Fallon had purchased land from defendant Bethman at a low elevation

---

**13.** The proposed industrial section would lie directly north of O'Fallon's existing industrial park area.

**14.** In accordance with Missouri clean water and federal environmental protection regulations all installed sewer pipes were of sufficient size to accommodate the area as it fully developed.

point in the eastern section for the construction of a lift station at which sewage could be collected from gravity lines and propelled along the forced main to the treatment plant. Most of the area, including the school and Monsanto,[15] are south of a watershed line that intersects the area and could be connected by existing or proposed gravity lines into the existing lift station on the Bethman property. As development would warrant gravity lines could be installed north of the watershed line to a proposed second lift station that would connect into the existing outfall line leading along highway 79 to the treatment plant.[16] O'Fallon was served by three deep water wells and treatment plants. One additional well and treatment plant not in service at the time of the trial was acquired several years before 1976 to provide additional water as needed. The new treatment plant would provide the greater treatment required for utilization of shallow water wells which would further augment O'Fallon's water supply. With reference to the proposed area one water line extended northward along highway M to highway 79 and the sewage treatment plant and a second line constructed by the school district extended northward from eastern O'Fallon to the school site. At the time of the trial O'Fallon was providing water to the school site, to several fire hydrants near the school and school bus facility, and to two customers and seven fire hydrants in the area along highway M. Both sewer and water service was thus available to some of the area's residents even at the time of trial, but at a higher rate than residents of O'Fallon paid.

 The fact that agricultural land in a proposed area has a value higher than its intrinsic value for farm purposes alone is an important consideration in forecasting future development. There is authority that agricultural land loses its value as such when its value becomes inflated because of its adaptability for prospective urban development and its proximity to existing utilities and municipal services. *City of Woodson Terrace v. Herklotz*, 349 S.W.2d 446, 452 (Mo.App.1961); *City of St. Joseph v. Hankinson*, 312 S.W.2d 4, 19 (Mo.1958); *Ozier v. City of Sheldon*, 218 S.W.2d 133, 137 (Mo.App.1949).

While the owners of the agricultural tracts were generally unable to testify as to the value of their land, there was testimony that land in the area for farm utilization alone was valued at between $500 and $700 per acre and no higher than $1500. Alfred Knobbe testified that he paid $1250 an acre for the 190 acres of land he developed northwest of O'Fallon and would expect to pay over $3000 an acre to develop property within the proposed area because much of it is closer to O'Fallon and already has sewer and water facilities available to it. Another real estate broker noted the availability of utilities but would value most of the area land "because of its location . . . [t]o a municipality, highways and railroads, and everything else that's adjoining this property which makes it valuable for industrial and residential and commercial development," and that "there [comes] a time that the land becomes too valuable to farm."

One resident-intervenor had testified in a prior court proceeding (to determine the value of his property taken by a sewer easement) that the value of his farmland was $4,000 an acre and conceded that his land was suitable for development and increased in value because of the availability

15. About 33 to 50% more sludge would be generated with additions due to annexation, including the Monsanto property. The cell then operating at the treatment plant handled 750,000 gallons per day, and with annexation a second cell could be added at a cost of $5,000. O'Fallon had submitted application for approval of the second modular cell.

16. Since only 300 acres of the area are north of the watershed line the proposed lift station would cost about $20,000. The mayor of O'Fallon testified that if the area were brought within municipal limits a program would apply in which the federal government would pay up to 90% of the cost of sewer construction for residential areas. As to industrial users the grant would still be made but they would have to reimburse the government over a 20-year period.

of a sewer. Another resident testified that he purchased 55 acres in the west-central section of the area in 1972 for $2000 an acre and another in the central region testified that several years earlier he had been offered $3000 an acre "[i]f they could take ten acres off the best of my ground where I couldn't get nowhere. . . . " He testified that while they planned to develop the property and had drafted contracts he was eventually told they could not "sell enough houses to pay for it." The land next to him "brought" $1260 an acre.

There is also sufficient evidence that O'Fallon satisfied the general standard that annexation be necessary or convenient to the exercise of municipal area government functions.

The interest of the school in the proposed area is a relevant consideration. Kenneth Brock, president of the school district's board of education, testified that it was the unanimous sentiment of all members of the school board and of the district's superintendent that annexation to the city of O'Fallon would inure to the benefit of the school. He noted O'Fallon's ability to provide better police protection, the need to utilize O'Fallon's sewer and water facilities, and the expectation that O'Fallon would improve area road conditions.[17]

At the time of trial O'Fallon was well into the planning stages on several roads that would provide better access to O'Fallon for residents of the area and better access for O'Fallon residents to the school. These roads would also help relieve traffic congestion in O'Fallon by providing an additional access route to highway 70 via highway 79 to the east. The designing of the road to the school was completed at the time of trial, application had been made for federal funding, and O'Fallon's voters had tentatively approved a bond issue for the city's portion of the funds. The other planned extension would provide area residents with

better access to O'Fallon's downtown area. Other roads were planned for the area as development warranted that would provide a unified system of highways between the two areas.

In many respects residents of the area enjoyed or had available many of the advantages offered by the city of O'Fallon, including shopping areas, parks, larger postal facilities, and places of entertainment. Other social and business ties were testified to. This is a factor to be considered. *City of St. Joseph v. Hankinson*, 312 S.W.2d 4, 19 (Mo.1958). Because of existing watersheds, utilities and thoroughfares there was demonstrated a relationship between the two areas such that it would be desirable that the planning of future utilities, roads and land use emanate from a common source. Such unified coordination of planning would be beneficial to both areas. The development of O'Fallon's comprehensive plan for the municipal area indicated that extensive planning had taken place for controlled development. Several of O'Fallon's schools, parks and residential areas border on the proposed area. O'Fallon thus has a legitimate interest in having control over future adjoining development so that it conforms to existing building standards and would not destroy the character of the present land use.

■ While certainly not determinative on the issue of reasonableness, regularity of boundaries is a positive factor in favor of annexation because it makes possible more efficient administration of such governmental services as police protection and sewer and water lines. *City of Perryville v. Brewer*, 557 S.W.2d 457, 462 (Mo.App.1977); *Johnson v. Parkville*, 269 S.W.2d 775, 777 (Mo.App.1954). A major factor in the holding of unreasonableness in *City of Mexico v. Hodges* was the extent to which annexation would have given the city irregular bounda-

---

**17.** Both sides produced evidence on how well O'Fallon was or was not maintaining its own existing streets. There was testimony that the great majority of its 43 miles of streets was paved, kept in repair and lighted. The assistant to O'Fallon's mayor and president of the board of education testified as to dangerous road conditions in the proposed area. Whether annexation would result in O'Fallon improving the safety of the area's roads was certainly a debatable issue.

ries. 482 S.W.2d at 547–548. The northeastern boundary of O'Fallon is now jagged and annexation of the area would result in the regularization of that boundary because of the uniform curvature of state highway 79.

The factor of regular boundaries helps to offset respondents' claim that the area is unreasonably large in relation to O'Fallon's existing size. The proposed area here is about three-fifths of the size of O'Fallon. In *City of Perryville* the annexation of an area three times the size of the existing city was approved, the court noting that the inclusion of some of the area was necessary to regularize the boundary. 557 S.W.2d at 468–469. *See also City of Lawson v. Cates*, 485 S.W.2d 146, 147 (Mo.App.1972), upholding as reasonable a proposal to annex an area much larger than the existing municipality.

The fact that O'Fallon owns property which its police patrol in both the western and eastern sections of the area resulted in O'Fallon's police cars traveling highway 79 and roads within the area several times on each shift. Their firing range was located at the treatment plant. Several area residents testified that they considered the county sheriff's patrol adequate and observed them in the area on a regular basis. A former member of the sheriff's office whose responsibility it had been to patrol the area for the county (but who worked for the O'Fallon police department at the time of the trial) testified that the sheriff's police served as "report takers" in the proposed area who responded to calls when they could but did not have time to make routine patrols of the area in an adequate manner. He testified that many times the county police had to call on O'Fallon to respond to a call when one of its own cars was unable to. Of an average 48 calls in the area per year, he reported that O'Fallon handled at least half of them for the sheriff's department.[18]

On the basis of this evidence we hold that the city of O'Fallon did sustain its burden of proof in creating a fairly debatable issue as to the reasonableness of its proposed annexation plan. Cognizant of the scope of our review under Rule 73.01 as interpreted in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), we reverse the judgment of the trial court which denied the declaratory judgment on the ground that the city had not sustained its burden of proof on the issue of reasonableness. We further hold that O'Fallon's petition did sufficiently describe the area sought to be annexed, that the class action was properly maintained, and that appellant has sustained its burden of proof with respect to all required elements under § 71.015, RSMo.

The judgment is reversed.

SNYDER, J., and STOCKARD, Special Judge, concur.

---

18. Some of the evidence considered on appeal was part of the record as an offer of proof. The issue on appeal is whether the evidence should have been admitted and considered, or rejected and not considered, and when that issue is determined the next issue is what the judgment should be based upon a consideration of the competent and admissible evidence. *Menos v. Hodges*, 499 S.W.2d 427, 429 (Mo. 1973).